For the reasons assigned, the judgment appealed from is affirmed.

---

(80 South. 652)

No. 21502.

LEE v. NEW YORK LIFE INS. CO. OF NEW YORK.

(Jan. 6, 1919. Rehearing Denied Feb. 3, 1919.)

*(Syllabus by the Court.)*

INSURANCE ⚖�death291(1) — FALSE ANSWERS IN APPLICATION—MATERIALITY—RECOVERY.

Where, in an application for life insurance, it appears that the applicant answered that he had had none of the diseases indicated or specified in a certain question 9, and that, save in a single instance—of temporary malaria—he had not consulted any physician for any ailment or illness not included in that question, and it is shown, in an action on the policy issued on such application, that, within the two or three years preceding the application, the applicant had, on several occasions, consulted physicians, had been told that he had a bad heart and treated for it, and, though not informed, in so many words, that he had Bright's disease, had, within a few weeks prior to the making of his application, three times called upon and consulted with his physician, by whom, on each occasion, a certain familiar test was made, to determine the question of the existence or progress of that disease, *held*, that the statement last mentioned was untrue, to the knowledge of the applicant; that the defendant would not have issued the policy if informed of the tests, without knowing the results; that the statement therefore operated to deceive it and induce it to issue the policy; that the deception related to a material fact of which defendant was entitled to be informed; and that, whether the statement be regarded as a representation or a warranty, there can be no recovery on such policy.

O'Niell, J., dissenting.

Appeal from Thirteenth Judicial District Court, Parish of Rapides; James Andrews, Judge.

Action by Mrs. Fannie Kelso Lee against the New York Life Insurance Company of New York. Judgment for defendant, and plaintiff appeals. Affirmed.

Blackman, Overton & Dawkins, of Alexandria, for appellant.

Hakenyos & Scott, of Alexandria, and Rice & Montgomery, of New Orleans, for appellee.

Statement of the Case.

MONROE, C. J. Plaintiff has appealed from a judgment rejecting her demand for $2,500, representing the amount called for by a policy of insurance issued by defendant upon the life of her husband and in which she is named as beneficiary. The defense is that the insurance was obtained by

certain untrue and fraudulent representations and concealments with respect to material facts, and that, instead of being insurable, and a man in perfect health, as he represented himself to be, the insured (whose death, during the life of the policy, is not now in dispute)—

"died on, say, August 8, 1914, of Bright's disease and œdema of the lungs, for which he had been treated by doctors and which said disease he had had long prior to the date of his said application, and that he was also suffering from a heart lesion, dyspepsia, dyspnea and other troubles, at the time of his application; and which said disease and troubles and the names of the physicians treating him at the time should have been disclosed by him in his application; and that, when the policy was delivered, he was not in good health, as required by said application."

The application bears date January 8, 1914, and was filled out by the defendant's medical examiner. Among the questions propounded to the applicant, in connection therewith, were the following:

"9. Have you ever suffered from any of the following diseases? Answer 'Yes' or 'No' to each part of this query below. Give explicit answers and particulars in each case. The examiner should satisfy himself that the applicant gives full and careful answers to this question."

"A. Of the brain or nervous system?

"B. Of the heart or lungs?

"C. Of the stomach, or intestines, liver, kidneys or bladder?

"D. Of the skin, middle ear or eyes?

"E. Rheumatism, gout or syphilis?

"10. Have you consulted any physician for any ailment or illness not mentioned above?"

To the several parts "A," "B," "C," "D," and "E" of the query "9," the applicant answered, categorically, "No," to which he added, "With the exception of malaria, as stated below, I do not recall of having ever been sick." To the question 10, he answered, "Yes," with the explanation that the consultation related to malaria; that he had had one attack, one year before; that it lasted three or four days, was mild; and that the physician whom he consulted was

Dr. Randolph, of Alexandria, where they both lived. On the form entitled "Medical Examiner's Report" (also attached to the application), that officer is asked, among other things, "Do you find, after careful inquiry and physical examination, any evidence of past or present disease?" (and then follow the specifications A, B, C, etc., as above given), and his answer in each case was "No"; and, under the heading, "Additional Remarks," he added, "The applicant (Chinaman) is a successful business man of exemplary habits." The certificate of the agents by whom the risk was solicited is also attached to the application and is an unqualified recommendation of the risk.

It is abundantly shown that the insured had the appearance of a healthy, active, and prosperous man, and was always to be found at his place of business, attending to his business. It is also shown by defendant's agents, of whom there were two (conducting the business in partnership), that the insured did not, of himself, apply for the insurance, but that they called upon him, on three occasions, and "worked on him" in the effort to get him to take it; that he, twice, refused so to do, saying that he did not want any more (having already one policy, issued by defendant, which he had taken out some years before); that it was too expensive; that he would insure his boys, when they returned from school, etc., and it was only upon the third visit of the solicitors, and after they had engaged the assistance of the plaintiff herein, that he was induced to make his application, and, even then, he resisted their effort to induce him to apply for $5,000, and applied for only $2,500, though he took out insurance on the lives of his sons. He died on August 8th, following, of Bright's disease, according to the testimony of his then attending physician, who had been called to see him in February, and who testifies that he found him suffering with that

complaint, and that he continued to get worse until he died. Dr. Randolph, the physician mentioned by the insured in his application, testifies that he had been his physician for about 25 years; that insured consulted him at his (the doctor's) office in November, 1911, and that he examined his urine and told him that it was not quite right "to see if it" (the unsatisfactory condition) "was permanent"; does not remember telling him, at any time, that he had Bright's disease or any disease of the kidneys, does not think that he did, but told him that he had a bad heart; that his heart was not good and that he had better be careful; told his wife (probably in 1912 or 1913) that he had an incurable disease of the kidneys, and she said:

"For God's sake! Don't tell him, as it would have a depressing effect on him, and, if you tell him a thing like that, he will just give up."

Testifying from his books, in answer to an inquiry as to what visits decedent paid to his office in 1912 and 1913, the witness says:

"In 1912, on the 24th of October, and on the 17th of November, he was there on his own account. He was there again on the 30th of January, 1913, and on the 30th of July, and on the 6th of December and 10th of November, and on the 20th of December and 27th of December, 1913. * * * They were office consultations. "Q. In relation to Jim Lee's health? A. I don't suppose he came there for fun, but suppose he came to see about the condition of his health. * * * I gave the man a proper physical examination; examined his urine, and examined him all over so far as that was concerned. * * * Q. That was in 1912? A. 1912 and 1913, specially in 1913. Q. At the time you made those examinations, did you disclose to him his physical condition? A. No, not entirely so. Q. Did you put him on diet? A. No, I told him what he should do; how he should care for himself and the life he should live in order to keep good health. Didn't prescribe any drugs, I don't think. * * * Q. In your statement, or death proof, you said that he died of Bright's disease. Is this statement made from that examination you made in 1912 and 1913? A. Is made from my knowledge of Jim Lee over the last two or three years of his life. Q. Then he had Bright's disease the last two or three years of his life? A. I believe so."

144 LA.—15

At another place in his testimony, Dr. Randolph, being again asked about visits in December, 1913, replied:

"None in December, 1913. In November there was. This" (probably meant for yes), "there was, on the 9th of December; among other things, was an examination of urine on the 9th of December, and on the 20th of December there was another examination of the urine, and on the 27th of December another—three examinations of the urine in December, 1913."

At still another place, he gives the following testimony:

"Q. Doctor, did Jim Lee have any pain or smothering feeling? A. When? Q. When you visited him at his house, or he consulted you? A. At times, I think he did."

Dr. Stafford testifies that he was called to visit the insured upon a night in May, 1912, and found him propped up in bed; he complained that he was smothering, and was frightened; examined him, and found that his condition was attributable to heart lesion, a leaking valve; visited him on the two following days, and thinks he found him in bed on each occasion; heart lesion is not necessarily fatal, but is a serious disease, and a leaking valve is incurable; did not tell the patient what was the matter with him, but thinks he gave a prescription and warned him to rest and not work too hard; gave him to understand that he was a sick man; told his wife that he had heart lesion, and is sure that he advised her how to take care of him; he (Lee) thought it was indigestion, and his wife had thought so. The witness was asked to put himself in the place of the insured and say what answer he would have made if asked whether he had ever had heart disease or suffered from any disease of the heart, and he replied:

"Well, he would have to answer it, as far as information he got from me, he would have to answer in the negative, because I told him nothing.".

He was subsequently asked:

"Well, if you were in Lee's place and under the information that you gave him, and the circumstances, if you were asked the question if he ever had any disease, or been sick, how would you have answered the question; the question, if you had ever been sick and, if so, of what disease?"

To which he replied:

"Of course, I don't know what Lee's impression was as to his sickness, but I would certainly have answered that I had been sick; because he was sick all right; but I don't know what impression he had of his condition."

Dr. Stafford was not asked what answer he would have made if, in Lee's place, he had been asked whether he had consulted any physician for any ailment or illness not mentioned in question 9 of the application.

Dr. Holliday was called, some time in July, 1914, to visit a daughter of the insured who was suffering with malaria, and he testifies that, while there, the insured came in complaining of shortness of breath, and required a stimulant, and (to quote the language of the witness):

"I just asked him a few questions and told him I would be back in the next day or two and give him a thorough examination. I just gave him a partial examination that evening, and he told me he had been suffering."

At that point, counsel for plaintiff objected to the repetition of any statement made by the insured, on the ground that, defendant having introduced in evidence the report of its medical examiner, showing that the insured was in good health when examined in January, 1914, could not be heard to contradict or impugn it by parol evidence which objection having been overruled, the witness proceeded:

"He said he had been suffering in that way something like a year. * * * Q. Did he seem to be in bad condition? A. At that time he was. He died in two or three weeks after that. * * * Q. Did he state to you that he was suffering from Bright's disease? A. No, sir;

but his wife told me so. Q. In his presence? A. No, she did not speak it out loud, but, just as I was fixing to go, she told me, but he did not say what it was. * * * She did not say that he had been suffering from Bright's disease at any time, or what time, but just told me that Dr. Gremillion, I believe, told her he had it, and she told me he had been in ill health for about a year, but did not say what he was suffering from; but she said, at that time, that Dr. Gremillion had told her he had Bright's disease, a few months before that."

The medical gentlemen seem to agree that one may have Bright's disease for many years without knowing it, and that it is impossible for a physician called in at a particular time to say how long a patient has had that disease, in a particular form.

## Opinion.

There is considerable more testimony in the record than that to which we have referred, some relating to Lee's knowledge or ignorance of the serious character of his ailment, and other offered to prove that, but for its acceptance as true of his answers to the questions which with the answers, were part of his application, defendant would not have insured his life; but there is nothing which in the slightest degree breaks the force of the testimony of Drs. Randolph and Stafford to the effect that he (Lee) consulted them during the two years preceding the date of his application, and that is particularly true as to the testimony of Dr. Randolph, that Lee came to his office to consult him, not "for fun," but about his health, at various times during the years 1912 and 1913, and that on December 27, 1913 (12 days before he applied for the insurance here in question) he (Randolph) made the last of three examinations of Lee's urine that were made by him during that month, and the last of a series that began on November 20, 1911, which testimony, we think, is determinative of the case; for if, instead of answering that he had never suffered from either of the diseases indicated or enumer-

ated in question 9, and had not consulted a physician for any other ailment or illness, except malaria, Lee had stated what had occurred in Dr. Randolph's office within the five preceding weeks, his policy of insurance would not have been issued. It is argued that he did not know that he had Bright's disease (but he was told by Randolph whom he was consulting at the time that he had a bad heart), and it is, or perhaps might be, argued that testimony as to what he said after the issuance of the policy was inadmissible as against the beneficiary; that defendant, having introduced in evidence, without qualification, the certificate of its medical examiner, is bound by its contents; and that a wife who, being informed that her husband is afflicted with an incurable disease of the kidneys and who, with that knowledge, aids in inducing him to take out insurance upon his life, is nevertheless entitled to receive the insurance. But we do not find it necessary to consider those questions, nor do we consider it necessary even to decide whether the answers of the applicant to the questions propounded in his application—which answers we have termed representations—are representations, within the meaning of the contract and of Act No. 52 of 1906, or warranties. It is sufficient, for the purposes of this case, as it appears to us, that the applicant for insurance, having, as part of his application and as an inducement to the issuance by defendant of its policy, stated that he had never suffered from any disease of either of the organs specified in the question 9 propounded by defendant, answered the question 10 propounded to him, by saying that, save in a single instance, he had never consulted a physician for any ailment or illness, other than those mentioned in question 9; that the statement last mentioned is shown, beyond dispute, to have been untrue, to his knowledge; that it was material to the question to be considered by the defendant; that defendant was thereby deceived and induced to do that which it would not otherwise have done, to wit, issue the policy herein sued on.

"A false statement as to whether applicant has consulted or been attended or treated by a physician is material to the risk and will defeat a recovery, especially where it is warranted to be true. But, even where the answers are made warranties, substantial truth is all that is required. In analogy with the rule as to the disclosure of temporary or slight ailments, it is held that medical consultation for merely slight or temporary indisposition need not be disclosed, the insured being entitled to a liberal construction of the language of the application." 25 Cyc. 816.

The distinction between temporary or slight ailments and those of a more serious character has heretofore been recognized by this court. Cole v. Mutual Life Ins. Co., 129 La. 712, 56 South. 645, Ann. Cas. 1913B, 748; Goff et al. v. Mutual Life Insurance Co., 131 La. 100, 59 South. 28. But the ailments with which the insured, in this instance, was afflicted, are shown to have been serious, and the evidence satisfies us that he was apprised of their character, not only by what was told him, but by the treatment that he received, more particularly from Dr. Randolph. We are equally satisfied that, if defendant had been informed that Lee had had his urine tested three times within the five weeks preceding his application, it would not have insured his life without knowing the result of those tests, and that the information that was withheld was therefore material.

The judgment appealed from is, accordingly,

Affirmed.

O'NIELL, J., dissents.

DAWKINS, J., takes no part.