70 So.2d 161 (1954)
FLINT
v.
PRUDENTIAL INS. CO. OF AMERICA.
No. 3782.
Court of Appeal of Louisiana, First Circuit.
January 29, 1954.
*162 Kaufman, Anderson & Leithead, Everett R. Scott, Lake Charles, for appellant.
Johnson & Morelock, Shreveport, for appellee.
CAVANAUGH, Judge.
Plaintiffs are the beneficiaries named in a life insurance contract issued by defendant on the life of Joseph F. Flint, husband of Jo Eddye Flint, and father of C. Jeanne Flint. The policy is for the sum of $10,000 and application therefor was made by the insured, Joseph F. Flint, on April 5, 1949. The policy was issued on May 3, 1949. The insured died on January 13, 1950. On September 15, 1950, plaintiffs, by separate letters through their attorneys to the defendant, elected to take settlement of the proceeds claimed to be due them under the policy by equal monthly installments for a period of ten years so as to include interest at the effective rate of 2% per annum on the unpaid balance. The method of settlement selected by plaintiffs as beneficiaries was one designated in the policy under Option 1.
The suit was filed on August 28, 1951, after demand had been made on defendant for payment of the installments which had accrued up to the time of the filing of the suit. The plaintiffs claim in their petition and pray for judgment in favor of Jo Eddye Flint in the sum of $881.28 and in favor of C. Jeanne Flint in the sum of $220.32, with interest on each of said sums at the rate of 5% per annum from judicial demand until paid.
The plaintiffs alleged that the insurance contract sued upon was issued in favor of Joseph F. Flint, insured, being policy number 1763092, which is attached to their petition as Exhibit "A" and which amount of $10,000 the defendant agreed to pay upon proof of the death of the insured, Joseph F. Flint; that the insured departed this life on January 13, 1950; that proof of death was submitted to the defendant soon after the death of the insured and that the defendant had failed to pay.
The defendant, having admitted the issuance of the policy and the death of the insured, defends the suit on the ground that the insured at the time of making the application for the insurance, which application was attached to the policy and made a part of the contract under the policy and under the statute, made false and fraudulent answers to the questions propounded by the examining physician, John R. Grigg. The particular questions propounded to the applicant and his answers, set out in defendant's answer and also reflected by the application which is attached to the policy, are as follows:
"9. Have you consulted or been attended by a physician or other practitioner for any reason during the past three years? Give dates, complaints, doctors' or practitioners' names and addresses. No.
"10. Have you ever been in a hospital, sanitarium, or other institution *163 for observation, diagnosis, rest or treatment. No.

* * * * * *
"12. Have you ever had (if "yes", underscore and give details in 18.)
"A. Heart murmur, shortness of breath, rapid pulse, abnormal blood pressure, or any other indication of a disorder of the heart or circulatory system? No.

* * * * * *
"E. Stricture, kidney colic or stones, the presence of albumin, blood, pus or sugar reported in your urine, or any other indication of a disorder of the genito-urinary system (including the bladder, kidneys, male or female organs)? Yes.
* * * * * *
"G. X-rays for diagnostic purposes or treatment, electrocardiogram or blood studies? Yes.
* * * * * *
"I. Any injuries or surgical operations? No.
"J. Any other illnesses or indications of any physical or mental disorder, defect or informity? No.
* * * * * *
"18. Give complete details of questions 2-17 answered `Yes'.
"12 E. Passed small stone from bladder size pin head. No operation. 2 days felt some pain. No complication, about August 1943 or 1944. Dr. Marshall, Sulphur, La. Later had X-ray made, was told not to worry for there was no more stones. No hospital treatment.
"12 G. Same as above 12 E."
The defendant further pleads that the answers to the above questions were grossly untrue within the insured's personal knowledge, were false, fraudulent, and made with an intent to deceive the defendant as to the true physical condition of the applicant; that said questions were material and said answers were the basis for the issuance of said policy; that, in truth and in fact, since on or about February, 1947, and down to the date of death of decedent:
"(1) Was afflicted with a marked case of hardening of the arteries, coronary sclerosis, pain in his chest, a `skipping and stopping.' heart, shortness of breath, and a serious circulatory disorder;
"(2) Was under the constant care and advice of physician;
"(3) Had consulted a heart specialist in Galveston, Texas;
"(4) Had made two trips to the Mayo Clinic in Rochester, Minnesota in the years 1947 and 1948 for his ailments;
"(5) Had been placed on a special diet and had been taking special treatment and special precautions for his ailments;
"(6) Had been hospitalized at the Mayo Clinic for about 10 days during the year 1948".
The defendant further pleads that the insured knew of his serious illness and physical condition, and that such disorders and ailments were of a permanent and substantial nature, and that if he had furnished the information requested truthfully, the policy would not have been issued. The defendant further alleges that the false statements of the decedent were made for the purpose of deceiving defendant and that they materially affected the acceptance of the risk and the hazard assumed by defendant when it issued the policy and that defendant relied upon the representation of decedent as material inducement for the issuance of the policy; that the statements made by the decedent were deceitful, untrue and fraudulent, and thus avoided the policy, rendering it null and void ab initio.
Defendant tendered to the plaintiffs the $975.39 cash which represented the payment of two annual premiums in advance by the *164 insured on the policy sued upon, together with interest at the rate of 6% per annum from date of payment of said premiums down to April 18, 1950, the date of such tender, which was acknowledged and declined by plaintiffs.
Upon the foregoing issues the case was tried in the District Court, and the Trial Judge rendered judgment in favor of defendant, rejecting the plaintiffs' demands at their cost.
From the judgment the plaintiffs have devolutively appealed to this court, and urge a reversal of the judgment of the District Court for the following reasons:
1. That the answers to the questions contained in the application and their materiality concerned matters of a temporary character and were not known to the insured to be material to the acceptance of the risk;
2. That the answers to the questions propounded were not fraudulently made and that they did not either materially affect the acceptance of the risk or the hazard assumed by the defendant as a matter of fact.
The facts in this case are undisputed that the insured, Joseph F. Flint, consulted his personal physician, Dr. W. A. Seale, between February 14, 1947 and February 13, 1949. He made approximately 14 visits, or had that many consultations with his personal physicians during that period. He made no mention of these consultations. During the early summer of 1947, Dr. Seale, in administering to the decedent, determined or diagnosed what he thought was arteriosclerosis. He referred the insured to Dr. George R. Herrman of Galveston, Texas, a heart specialist. Dr. Herrman made an examination of decedent and, on April 9, 1947, in a detailed report to Dr. Seale of Sulphur, Louisiana, reported decedent's condition. The insured for several months had been complaining of pains in his chest, and Dr. Herrman's comment in his report of April 9, 1947, concerning his examination of the insured is as follows:
"Comment: This patient's pains are most likely all radicular in type, originating from the nerve root under pressure of the arthritis of the spine. This, of course, should be confirmed by x-ray. He does have a loud aortic second and a slight systolic murmur, signs suggestive of some aortitis. The difference of the blood pressure of the two arms, and a high blood cholesterol suggest the possibility of plaques in the left subclavian. I believe, therefore, that the patient should be on a low fat intake and probably take some decholesterizing agents. Potassium iodide would seem to be rational, sat. sol. 10 ftts. t.i.d. increasing a drop a dose a day up to 30 gtts. The potassium would also act as a sedative to the heart muscle and erase the ectopies. If this does not do so, quinidine should be used. Aminophyllin as a vasodilator in doses of 0.2 gm. is in order t.i.d. The patient should not use tobacco in any form. I did not investigate his leucocytosis as that had been done in Houston. I was surprised, however, that a sternal marrootrophy and study was not made. If his leucocytosis persists, it should be done."
The insured, being dissatisfied with Dr. Herrman's examination and on the advice of Dr. Seale, went to Mayo Clinic at Rochester, Minnesota, during September of 1947 and had a thorough physical examination and check-up under the supervision of Dr. Mavis Kelsey, who diagnosed his ailment as arteriosclerosis obliterans. It was recommended both by Dr. Herrman and Dr. Kelsey that the insured discontinue smoking and follow a diet prescribed.
The insured returned home and continued his usual vocation as drilling superintendent for the Union Sulphur Company, which position he had had for several years, and he returned for an annual checkup at Mayo's in July, 1948. While there on this second occasion, he had an ingrowing toenail, or infected large toe, and, on account of this condition, he was hospitalized for a few days until this condition was relieved. The illness with which the insured was suffering did not incapacitate him. He continued his usual work without *165 any loss of time and no serious illness until the month of October, 1949, when he was returning from Opelousas, Louisiana, he suffered a severe pain in one of his legs, which was later determined to be a thrombo phlebitis in his left leg. Dr. Kelsey and another physician from Houston, Texas, came to Lake Charles, and at St. Patrick's Hospital performed an operation on the veins on his left leg. Later, during the month of November, he was transferred to the Hermann Hospital in Houston, Texas, for treatment.
A biopsy was made on or about December 23, 1949. It was definitely determined that the insured was suffering from multiple carcinoma, from which, on January 13, 1950, he died. An autopsy later did not reveal the original source of the carcinoma. The evidence of all the attending physicians from the time of his admission to the hospital in Houston until his death is that the cancer was the cause of the death, but some of them think that perhaps the arteriosclerosis obliterans was a contributing cause.
The entire record of examination and treatment of the insured at Mayo Clinic was filed in the record. The report of Dr. Kelsey to Dr. Seale on the first visit, which report is dated October 8, 1947, is as follows:
"Thank you very much for referring Mr. Joseph F. Flint of your city to the Clinic for examination. He complained of irregular heart beat which had given him a great deal of trouble during the past two years. The electrocardiogram we took was almost identical to the one taken by Dr. De Laureal and we saw no abnormalities except the extrasystoles. We emphasized your previous instructions to him to avoid coffee and cigarettes. We could find no other evidence of heart disease, but in the face of his rather marked peripheral arteriosclerosis it is very likely that he has coronary sclerosis. We were surprised to find a very marked degree of peripheral arteriosclerosis.
"The patient was seen in consultation by Dr. N. W. Baker of the Section on Peripheral Vascular Diseases, who recorded the following status of the pulses. The right brachial was normal while the left brachial was greatly diminished. The right radial and ulnar were normal while the left radial was greatly diminished and the left ulnar was absent. The right femoral pulses could not be felt and the left were greatly diminished. The right posterior tibial and dorsalis pedis were completely absent. The right popliteal was also absent. The left popliteal and left dorsalis pedis were completely absent and the left posterior tibial was barely palpable. There was moderate pallor of the right foot on elevation but a fairly rapid return of color on dependency with normal vein filling. There was some pallor of the left hand on elevation with a fairly rapid return on dependency. In spite of the marked loss of pulses the patient apparently had a good collateral circulation. The diagnosis was arteriosclerosis obliterans involving the larger vessels.
"The blood cholesterol was elevated (317 milligrams per cent), as were all of the lipoids with total lipoids of 1054 milligrams per cent. X-rays of the pelvis and of the right extremity surprisingly revealed no calcification of the vessels except in the arteries of the feet. Mr. Flint was instructed in the care of his feet and advised to stop smoking for ever. We also told him that it probably would be a good idea to drink an ounce of whiskey before meals and to continue on the low-animal-fat, low-cholesterol diet. * *"
The report of the second visit, dated August 3, 1948, reads:
"Thank you very much for sending Mr. Joseph F. Flint of your city to the Clinic. As we discussed a year ago, he has rather marked arteriosclerosis obliterans. When he arrived here, he had an infection around the left big *166 toenail. He was hospitalized for ten days, during which time he had Sanders bed therapy and warm dressings. The infection healed very well. Mr. Flint has taken very good care of himself and has followed his medical treatment very conscientiously. We recommended that he continue the low-cholesterol, low-fat diet, that he avoid smoking and that he soak his feet in potassium promanganate solutions for a few minutes at a time once a day for ten days after he returns home to avoid possible fungus infection.
"Urinalysis, blood counts, flocculation test for syphilis, chest x-ray, electrocardiogram and basal metabolic rate (-9 per cent) were negative or normal. The plasma cholesterol determinations were 283 milligrams per cent and 277 milligrams per cent, while the fatty acids were 810 milligrams per cent and the total lipoids were 1147 milligrams per cent. There was some diminution in the pulses of the left brachial, radial, ulnar arteries. All leg pulses were greatly reduced and the right popliteal dorsalis pedis and posterior tibials could not be palpated."
Decedent held a responsible position in industry as drilling superintendent for the Union Sulphur Company. He was earning $12,000 a year and was 51 years of age. The questions contained in the form of application for life insurance were in simple language, and that the insured did understand the questions and their purport is revealed in the testimony of Dr. Seale as follows:
"Q. Did Mr. Flint ever talk to you about life insurance? A. I don't remember him discussing life insurance matters with me.
"Q. Don't you remember that he asked you or stated to youmaybe not in these words, but that he had applied for some insurance and he asked you if he should have told them about his condition? A. Yes, he did."
The plaintiffs took the position in the lower court, as well as here, that since the insured did not die from arteriosclerosis obliterans, the answers he gave to the questions propounded in the medical examination for the insurance were not material and did not affect either the acceptance of the risk or the hazard assumed by the defendant in issuing the policy, and that the defendant had failed to establish any fraud on the part of the insured.
This policy contract was issued subsequent to the adoption of the Insurance Code of the State of Louisiana by Act No. 195 of 1948, which is the present law covering this case. The pertinent sections of this law are as follows:
"A. Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or "A. Except as provided in Sup-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
"B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer." LSA-R.S. 22:619.
The plaintiffs cite and rely principally upon those cases where an applicant failed to disclose a minor ailment or where the insurer failed to prove fraud under the statute, prior to the adoption of the Insurance Code in 1948. We will here attempt to review the cases under the questions presented to determine whether or not they should be controlling in the case at bar.
In Cunningham v. Penn Mutual Life Ins. Co., 152 La. 1023, 95 So. 110, 112, the defenses *167 pleaded were suicide and that deceased answered falsely certain material questions propounded in his application for insurance concerning his habits and his having consulted physicians about his health. The application propounded questions about many diseases of which the Court names 42, but nowhere did the inquiries "ask a question that was calculated to disclose such a condition" as plaintiff had. Therefore, the Court held the failure to ask for the information was an "exceedingly strong presumption of its lack of importance". Fraud was not alleged. The Court held the failure to disclose did not avoid the policy because of absence of fraud and lack of materiality. Act No. 52 of 1906. Questions untruthfully answered in the case at bar were calculated to disclose decedent's physical conditions which materially affected acceptance of the risk or the hazard assumed.
In Valesi v. Mutual Life Ins. Co., 151 La. 405, 91 So. 818, 819, the policy was issued February 1, 1918 and the insured died August 20, 1918. The defenses were suicide and misrepresentation as to the use of intoxicants. The law applicable is Act No. 52 of 1906, as amended by Act No. 227 of 1916, and the Court quotes the phrase therein: "`All statements purporting to be made by the insured shall in the absence of fraud be deemed representations and not warranties.'" The Court simply held that the representations by the deceased were not fraudulent. The Court also makes the point that even if the representations were false but not fraudulent, recovery on the policy would not be defeated unless the use of intoxicants had contributed in some way to the death of insured, which was not found to be the case.
The next case cited by plaintiff as controlling is Thweatt v. National Life & Accident Ins. Co., La.App., 46 So.2d 637. This case involves an industrial life policy issued without medical examination but upon written application. The application was dated October 13, 1947; the policy was issued November 17, 1947, and the insured died November 4, 1948. The deceased was found to have a tumor in the chest cavity by X-rays taken in January, 1947. This fact was not disclosed by the application, and the insurance company resisted payment on the policy. This application was without a medical examination, and the representative of the insurance company put information on the application showing that it had been approved and that the applicant had had a policy for $9500 issued on his life on a medical examination. This case falls under the law in force prior to 1948 and is strictly a matter of proving fraud. As pointed out previously, the case at bar does not necessarily have to involve fraud as was the requirement prior to 1948. Not depending alone on fraud and in the final analysis practically admitting the absence of fraud, the case at bar is in no way solved by the findings in the Thweatt case.
The case of Boisblanc v. Louisiana Equitable Life Ins. Co., 34 La.Ann. 1167, is offered in connection with the concept of death from a cause other than that alleged as the basis for the false statement. It is our interpretation of the law governing the decision in the case at bar that the cause of death is immaterial, as before stated, if the insured died of an undisclosed disease which, if the questions had been truthfully answered, would have been disclosed. Such misrepresentations would tend strongly to bar recovery under the policy, but the mere fact that the insured died of something else, such as an act of God, for example, would be of no aid to the insured's cause. The law simply does not contemplate that insurance policies issued on false statements shall be made good by the turn of the wheel of fortune. It is well known that life insurance is not founded upon chance but rather upon the law of averages.
The case of Walters v. Reliance Industrial Life Ins. Co., 180 So. 880, is cited in connection with the contention that deceased did not realize the seriousness of his condition. This case is on a policy of industrial life insurance, and the law applicable is Act No. 160 of 1934. This statute applies strictly to industrial insurance. It has no application to the case at bar.
*168 The next case cited by plaintiffs is Eagan v. Metropolitan Life Ins. Co., 181 La. 16, 158 So. 575. This case depends on the application of Act No. 97 of 1908, which provides for waiver of forfeiture of policy by insurance corporations where insurance is issued without a medical examination. It is a special law covering such life, health and accident insurance. It has no application to the facts and is an entirely different statute than that which must govern the case at bar.
Goff v. Mutual Life Ins. Co., 131 La. 98, 59 So. 28, is simply to the effect that an undisclosed case of malaria twelve months prior to the application for life insurance was not held to be such misrepresentation as to void a policy under Act No. 52 of 1906. Fraud is the foundation of this case. It was held not proved. We do not see that this case casts any light on the case at bar when same is considered under the present statute. LSA-R.S. 22:619.
The last case cited by plaintiff in this part of his brief is Cole v. Mutual Life Ins. Co., 129 La. 704, 56 So. 645. Here the policy lapsed for failure to pay a premium. Four days later, application for reinstatement was made. Defendant claims this application for reinstatement contained false statements as to insured's health, and, therefore, the policy was void. The policy lapsed October 2, 1908, was reinstated October 6, 1908, and insured died February 4, 1909. It was claimed that information regarding an attack of measles in November, 1907, was concealed. It is admitted that there were after-effects, and a doctor was consulted in November, 1908. It was held that statements as to present health were representations and not warranties. Fraud was alleged but held not proved. In this case, as in all the others, the law applicable is entirely different from the present statute. Fraud had to be proved in the Cole case. It does not have to be proved in the case at bar.
Every case cited by plaintiff except on what he calls "Legal Authorities on the General Issue", pp. 18-25 of his brief, rests squarely upon the proof of fraud and upon an old statute no longer in force, except the Eagan case, and the rules of law involved in that case certainly have no application to the case at bar.
Plaintiff then moves on to the question of "Materiality of the Cause of Death", p. 25 of his brief. The cases cited have been examined. Of course, plaintiff would like to draw favorable conclusions from them by showing distinguishing features, lack of authority, improper interpretation, etc., but so far as we can determine this question can properly be entirely pretermitted as was done by the Court, and so admitted by plaintiff, in the Louisiana case of Lee v. New York Life Ins. Co. 144 La. 445, 446, 80 So. 652. The fact that deceased did not die from a condition about which false statements were made in his application is entirely irrelevant. False statements in answer to questions about consultation with physicians and hospitalization have been definitely held to be material, and these, per se, are not even indicative of any particular ailment and, therefore, could not have a direct relation to the cause of death. So no matter what caused death, it could not be said to be different than somthing misstated in the application. As before stated, the law simply does not contemplate that life insurance obtained through false statements shall be made good by the good luck of having death come through some cause unrelated to the false statements. Such a theory is absurd. But, be that as it may, the law, LSA-R.S. 22:619 specifically contemplates the avoidance of life insurance after the death of the insured where false statements materially affected either the acceptance of the risk or the hazard assumed by the insurer, and this is a matter for the court to decide. On this point will be found a short statement in 29 Am.Jur., p. 424, Determination of Materiality, as follows:
"Whether a life insurance policy would have been issued had true answers been given in the application cannot be left to the determination of *169 the insurer after the death of the insured. The matter is not one to be settled by the mere pronouncement of the company after the death has occurred, but the matter represented must be of that character which the court can say would reasonably affect the insurer's judgment as to the nature of the risk and amount of premium."
The defendant relies upon the case of Lee v. New York Life Ins. Co., 144 La. 445, 80 So. 652, and the case of Rhodes v. Metropolitan Life Ins. Co., 5 Cir., 172 F. 2d 183, 186. In the Rhodes case, all of the Louisiana cases were reviewed which had been decided under Act No. 52 of 1906 and Act No. 227 of 1916. The Court said:
"Act No. 227 of 1916 provides that every policy of insurance issued by any life insurance corporation doing business in the State shall contain the entire contract between the parties and that nothing shall be incorporated therein by reference to any constitution, by-laws, rules, applications, or other writings, unless the same are endorsed upon or attached to the policy when it is issued; and that all statements purporting to be made by the insured shall in the absence of fraud be deemed representations and not warranties. Interpreting this act, the Supreme Court of Louisiana has held: (1) that questions in an application as to diseases or consultations, addressed to an applicant for life insurance, are to be understood to refer to substantial or appreciable disorders, not to indispositions of a temporary character. Carroll v. Mutual Life Ins. Co., 168 La. 953, 123 So. 638; Cunningham v. Penn. Mutual Life Ins. Co., 152 La. 1023, 95 So. 110; Goff v. Mutual Life Ins. Co., 131 La. 98, 59 So. 28; Cole v. Mutual Life Ins. Co., 129 La. 704, 56 So. 645, Ann.Cas.1913B, 748; (2) that the defendant has the burden of proving fraud: Valesi v. Mutual Life Ins. Co., 151 La. 405, 91 So. 818; Mutual Life Ins. Co. v. Rachal, 184 La. 430, 166 So. 129; (3) that it is only when he sustains this burden that the statements become warranties, the falseness of which will avoid the policy, regardless of their materiality: Goff v. Mutual Life Ins. Co., supra; and (4) that in the absence of fraud, all statements are representations, and, in order to avoid the policy, the misrepresentations must be material to the risk. Goff v. Mutual Life Ins. Co., supra; Cunningham v. Penn. Mutual Life Ins. Co., supra; Valesi v. Mutual Life Ins. Co., supra; Mutual Life Ins. Co. v. Rachal, supra; and Carroll v. Mutual Life Ins. Co., supra. Whether false answers knowingly made are fraudulent, as a matter of law, we need not now decide. It is sufficient, if admitting the good faith of the insured, the evidence establishes misrepresentation of a material fact of such import that had the truth been revealed the policy would not have been issued. Assuming that the insured was not guilty of fraud but was acting in good faith, the decisive question is whether the representations were material to the risk. We think, as a matter of law, they were. It cannot reasonably be supposed that the insurance company would have issued the policy if it had been informed of Dr. Hirsch's examinations, the tests he made, his diagnosis, and the treatment he prescribed and Dampf followed. Where all the testimony relating to a question of fact excludes every reasonable inference but one, the issue becomes one of law for determination by the Court. Lee v. All States Life Ins. Co., 49 Ga.App. 718, 176 S.E. 811, 813. The insured was shown to be a man of affairs, with fairly large business interests, and must have known that the purpose behind questions concerning his health and habits was to enable the defendant to determine whether it would issue the policy. The statement of the court in First Trust Co. of St. Paul v. Kansas City Life Ins. Co., 8 Cir., 79 F.2d 48, at page 54, is apposite: `* * * He could not have regarded a diabetic ailment as so trivial that an insurer would not want to know about *170 it. The only possible rational explanation of his conduct is that he willfully made the false statements for the purposes of concealing the facts and of deceiving the insurer so that he might procure a policy which, if this truth were known, might be refused. In this situation of fact the only question is one of law and that is easy of solution. The law is that where the insured, in his application, intentionally makes a false statement about a material matter, the policy may be avoided. * * *' See also Lee v. New York Life Ins. Co., 144 La. 445, 80 So. 652, and Jefferson Standard Life Ins. Co. v. Stevenson, 5 Cir., 70 F.2d 72."
See also Appleman's Insurance Law and Practice, Vol. 1, Chapter 12, § 249, page 278.
When the present Insurance Code was adopted by Act No. 195 of 1948 and subsequently incorporated in LSA-R.S., volume 15, Title 22, the existing insurance laws were completely revised and also incorporated many provisions entirely new to Louisiana. It made no radical change with respect to warranties and representations in applications for insurance except in subsection A of Section 619, Vol. 15, LSA-R.S., page XXIX. The decisions of the Supreme Court of this State for forty years, or since the enactment of Act No. 52 of 1906, had become a part of the previous statutes. When the Insurance Code was adopted, the pronouncements of the courts construing the statute under consideration were concisely stated in what is now LSA-R.S. Title 22, subsection B of Section 619. There has been no change in this particular part of the law except as stated above. Some of the conflicting perplexities created by decisions growing out of cases which the court had been called upon to decide over a period of forty years has resulted in the codification and clarification of a statute which previously had been uncertain.
It is our opinion that a false statement in an application for life or accident insurance policy voids the policy if made with intent to deceive or if the false statement materially affects either the acceptance of the risk or the hazard assumed by the insurer.
The evidence in this case, beyond question, shows that the insured, at the time of answering the questions and signing the application, was suffering from a substantial disorder or ailment, classified as arteriosclerosis obliterans, or hardening of the arteries. All of the doctors agree that it is a progressive disease and is incurable once it has taken hold of a person.
We think that the action of the insured in this case in falsely answering the questions propounded and failing to disclose the consultations with Drs. Seale, Herrman and the two visits to Mayo Clinic at Rochester, Minnesota, at least deprived the insurance company of the opportunity to make further inquiry before it accepted the risk and issued the policy. The questions embodied in its application intended to furnish it with information so it could determine whether or not it would accept the risk and assume the hazard of insuring the life of the decedent. This was its prerogative after it had an opportunity to appraise truthful answers of the applicant regarding consultations with physicians for any substantial or serious illness or disorder within the period inquired about.
The defendant made a tender of the sum of $975.39, which it had received as premiums and which was declined by plaintiffs. The Lower Court did not render a judgment for this amount in favor of plaintiffs-appellants. The Lower Court's judgment will be amended to render judgment in favor of plaintiffs for a return of the two premiums, aggregating the sum of $975.39.
For the reasons assigned, the judgment appealed from is amended by rendering judgment in favor of plaintiffs and against defendant for the sum of $975.39, but otherwise the judgment is affirmed, all at the cost of the appellants.