163 So.2d 177 (1964)
Sally RADOSTA, widow of Peter Radosta
v.
The PRUDENTIAL INSURANCE COMPANY OF AMERICA.
No. 1368.
Court of Appeal of Louisiana, Fourth Circuit.
April 6, 1964.
Rehearing Denied May 4, 1964.
Writ Refused June 30, 1964.
Tucker & Schonekas, Gibson Tucker, Jr., New Orleans, for plaintiff and appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, A. J. Waechter, Jr., John V. Baus and Charles W. Lane, III, New Orleans, for defendant and appellee.
Before McBRIDE, REGAN and CHASEZ, JJ.
McBRIDE, Judge.
The beneficiary, Mrs. Sally Radosta, seeks to recover by this suit the avails (some $10,000) of an insurance policy issued by defendant on the life of her husband, Peter Radosta, and the insurer's special defense to the suit is that certain untrue material statements were knowingly made by the insured in the application for said insurance, which rendered the contract null, void and unenforceable; that such false representations affected the acceptance of the risk and *178 the hazard assumed by defendant; that had defendant been informed of the true condition of decedent's health, it would not have issued the policy.
The policy, dated September 28, 1959, was issued after a medical examination of Radosta had been made by the insurer's physician in connection with which he was required to answer in writing interrogatories regarding his health and past medical history. Said interrogatories and the insured's signed answers thereto constitute "Part 2" of his application for the insurance, a copy thereof being attached to and made part of the policy in accordance with LSA-R.S. 22:618(A).
With reference to the propounded questions, Radosta answered "no" when asked whether he had within the last five years consulted or had been attended or examined by any doctor or other practitioner or whether he had ever been treated for or had any known indication of high blood pressure, dizzy spells, ulcer of the stomach or intestines, or disease or disorder of the heart, blood or blood vessels, stomach, intestines, or kidneys, bladder, or any part of the urinary tract. He declared "that all of the statements and answers to the above questions are complete and true and agrees that the foregoing together with this declaration shall form a part, designated as Part 2, of the application for insurance."
Radosta died at age 52 on November 14, 1960, during the contestable period of the policy. The cause of death (which is undisputed) as shown by the death certificate is acute myocardial infarction due to a probable coronary occlusion and probable coronary arteriosclerosis.
From hospital records and uncontradicted testimony of physicians who attended decedent, it abundantly appears that Radosta's answers to the medical interrogatories were false and untrue. He made no disclosure of the fact that he had been hospitalized at Touro Infirmary in New Orleans from September 23, 1958, to October 4, 1958, for treatment of a bleeding duodenal ulcer. The hospital report reveals also that a physician was called in for consultation because Radosta also suffered from chronic prostatitis, a urethral stricture and multiple diverticula of the bladder. He was subjected to various tests and surgical procedures. The results of the gastro-intestinal series indicated the patient had a hiatal hernia, an irregularity in the outline of the pre-pyloric portion of the stomach, a post-bulbar ulcer, and diverticula in the descending duodenum. One of the attending physicians stated Radosta should have been re-examined after appropriate therapy to exclude the possibility of a pancreatic lesion. X-ray examinations of his chest while in the hospital indicated that the decedent had diffuse dilatation and tortuosity of the aorta, a condition suggestive of cardiovascular disease.
The insured also failed to disclose that he had been treated continuously after his discharge from the hospital by a urologist during the year immediately preceding his application for insurance. The physician testified that Radosta came to his office October 6, 1958, and an examination revealed he still had a "fairly heavy infection of the urine" and that the "prostate was loaded with pus and bacilli."
Radosta visited the physician five times between October 1958 and January 1959, and on one occasion his temperature was 102 degrees because of the infection. In February 1959 Radosta complained of feeling badly, was nervous, and experienced frequency and burning on urination. At that time his physician found the infection still prevalent and prescribed an antibiotic. Radosta saw the physician on three occasions in February 1959, three times in March 1959, twice in April 1959, once each in May and June and again in late July 1959. The latter visit was just two months prior to the date of the completion of the application for the insurance.
Radosta's physician related that he dilated the urethral stricture as often as he could and his opinion was it would have been *179 advisable for the patient to continue the dilation for the rest of his life inasmuch as his condition was not "completely curable." On cross-examination the physician was asked if Radosta's condition would have any effect insofar as life expectancy is concerned, and the answer was that the condition would be a definite "downhill course" if the patient neglected treatment of the stricture.
In May 1959, Radosta was treated by a physician for complaints of dizziness, and it was discovered that his blood pressure was then elevated, 158/104. The treating physician stated that he informed Radosta his blood pressure should be rechecked and that it would be advisable "to take it a little bit easier and not put so much stress on himself."
We are well convinced that decedent was in poor health for a considerable period and up to the time of the application for the insurance. We are likewise convinced Radosta was a poor risk for life insurance. Indeed, the associate medical director of defendant's southwestern office in Houston testified that had the decedent correctly answered the medical questionnaire by giving the above particulars with reference to his medical history, he would not have been accepted as a risk and the policy would have been withheld from him on account of several of his ailments, and that others would have justified a higher premium rate on any policy issued. The examiner stated that the urethral stricture and infected urine alone would have been a cause for outright rejection of the application for insurance. He further was of the opinion there could have been a connection between the cause of Radosta's death and the condition of the aorta and the hypertension (high blood pressure).
Counsel for appellant argue that the questionnaire form was prepared by the defendant quite obviously with little degree of care toward ascertaining pertinent facts, that is, matters which would be material to the risk which the company was asked to assume. We do not at all agree with counsel as the testimony of the medical examiner makes it certain that the insurer relies implicitly on an applicant's answers to the medical questions when making determination whether insurance should be issued.
Appellant also calls to our attention the fact that the policy was written at the insistence of defendant's agent and it was not Radosta who approached the insurer for the insurance. It makes no difference at whose instance negotiations for the policy were initiated because, in any event, Radosta would not have been relieved of the necessity of making full disclosure to the company as to his health and past medical history.
Additionally, plaintiff's counsel point-up the fact that the interrogatories were not read to Radosta by the examining physician as they appear in the application, but that the examiner propounded one or more of the questions in paraphrastic language. Counsel deduced that this possibly induced errors in the answers. We do not think that the paraphrasing would induce errors. The questions are couched in somewhat technical language, and we believe that the physician's asking them in layman's language would, on the contrary, tend to eliminate misunderstanding. The physician admitted he filled in the answers on the form, but from a reading of his testimony we cannot believe he failed to write down anything that was told to him by Radosta or that he erroneously wrote down what Radosta said. The examiner testified:
"I wouldn't put something down that I knew was wrong."
Counsel also point out that Question No. 8, which required an answer whether Radosta within the last five years had consulted or been attended or examined by any doctor, was given an erroneous "no" answer. They call our attention to the fact that notwithstanding that the examiner had answered the question in the negative, he, at the end of the questionnaire, wrote that on May 12, 1956, Radosta had undergone surgery for hernia. We do not think that any importance *180 should be attached to the fact that the question was answered "no" when as a matter of fact the correct answer should have been "yes." It seems to us that the examiner merely qualified the "no" answer by the notation of the surgery of May 1956.
In order to invalidate a life insurance policy on the ground that the insured had made false answers to questions propounded by the examining physician in connection with the application for the policy, it is not necessary for the insurer to prove fraud on the insured's part. LSA-R.S. 22:619(B). It is now well settled by the jurisprudence of this state that false representations in an application for life insurance will furnish ground for forfeiture of the policy if they relate to matters material to the risk, the test of materiality being whether knowledge of the facts would have influenced the insurer in determining whether to accept the risk or in fixing the amount of premiums. Roche v. Metropolitan Life Insurance Company, 232 La. 168, 94 So.2d 20; Lee v. New York Life Ins. Co. of New York, 144 La. 445, 80 So. 652; Karno v. Metropolitan Life Insurance Company, 137 F.Supp. 893, 242 F.2d 141; Rhodes v. Metropolitan Life Ins. Co. 5 Cir., 172 F.2d 183; Kennison v. U.S. Letter Carriers' Mutual Benefit Association, La.App., 132 So. 2d 94; Flint v. Prudential Ins. Co. of America, La.App., 70 So.2d 161.
See, also 12 Appleman, Insurance Law and Practice, Section 7294, page 403, wherein it is stated:
"The most generally accepted test of materiality is whether or not the matter misstated could reasonably be considered material in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, or in fixing the premium rate thereon. * * *"
It makes no difference whether the insured dies from a condition about which a false statement was made in order for the false representation to be deemed material to the risk. A causal connection between the facts misrepresented and the death of the insured is not necessary to establish the insurer's right to claim forfeiture of the policy. Roche v. Metropolitan Life Insurance Company, supra; Flint v. Prudential Ins. Co. of America, supra.
The record makes it certain that the insured at the time the application was made to the insurer was in poor health, of which fact he was well cognizant. Moreover, he was bound to have known the seriousness of his condition because of the variety and number of treatments and the various tests which were necessary. There can be no doubt that the information withheld was material and that the insurer would not have accepted the insurance risk on Radosta's life without further proof of insurability. We can find no error in the judgment appealed from. The judgment is therefore affirmed.
Affirmed.