169 So.2d 203 (1964)
Mrs. Vivian LAMARK
v.
LINCOLN INCOME LIFE INSURANCE COMPANY.
No. 1566.
Court of Appeal of Louisiana, Fourth Circuit.
November 2, 1964.
Rehearing Denied December 7, 1964.
Writ Refused February 5, 1965.
Stanley H. Levin, New Orleans, for plaintiff-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Charles W. Lane, III, New Orleans, for defendant-appellee.
Before McBRIDE, YARRUT and BARNETTE, JJ.
McBRIDE, Judge.
Plaintiff appeals from a judgment dismissing her suit to recover, as beneficiary, the face value (and a like amount for accidental death) of a policy of life insurance dated September 1, 1961 issued on the life of her husband and the members of his family by defendant insurer, and the defendant's special defense to the suit is that certain untrue and material statements pertaining to the insured's state of health were knowingly made by both the insured and plaintiff as beneficiary in the application for said insurance which rendered the contract null, void, and unenforceable; that such false representations affected the acceptance *204 of the risk and the hazard assumed by defendant in issuing the policy; that had the insurer been informed of the true condition of the decedent's health it would not have issued coverage on his life. Decedent died during the contestable period.
Plaintiff and her husband made application in writing for the policy on July 29, 1961; the printed form of the application was filled out by the insurance agent and signed by them; it contained some 34 specific questions regarding the physical condition and state of health of the insureds. There was no medical examination. The insurer's agent freely and frankly admits that he did not propound every question contained in the application regarding the insured's health to the applicants or that he inquired of them about every named disease or ailment listed on the various subdivisions of each question. However, the record abundantly shows the agent did ask certain pertinent questions to plaintiff and her husband.
Question 10 in the application reads as follows:
"10. Has proposed insured, wife or any child ever:
"a. Consulted or been treated by any physician or practitioner in past 5 years? Give name, address, details. * * *?"
and question 29 of part II reads:
"29. Have you consulted a physician or received hospital or sanitarium observation or care during past five years?"
The agent testified:
"Q. Mr. Martinez, Question 10(a) of the application for insurance states, has proposed insured's wife or any children ever consulted or been treated by any physician in the past five years. Did you ask that question?
"A. Yes.
"Q. Of both the husband and wife?
"A. Yes.
"Q. What was the answer?
"A. The answer was `No.'
"Q. Twenty-nine reads as follows: `Have you consulted a physician or received hospital or sanitarium observation or care during the past five years.' Did you ask Mr. Lamark that question?
"A. Yes, sir, I asked that question, not exactly the words you're reading to me. I asked if he had been hospitalized in the last five years.
"Q. In the last five years?
"A. Yes.
"Q. What did he say to that?
"A. No.
"Q. Was Mrs. Lamark there at the time?
"A. Yes, she was.
"Q. Did anyone, Mr. or Mrs. Lamark, state to you on this date or any other time before the application or after the application, that Mr. Lamark had been a patient in Charity or had convulsions?"
The agent after obtaining the above information from plaintiff and decedent proceeded to fill in a "no" answer to all questions, particularly 10(a) and 29.
There is not the remotest doubt that the answers given the agent when he propounded questions 10(a) and 29 were far from the truth because it is shown abundantly by the record that the decedent was then in very poor health and to say the least a bad insurance risk.
The applicants did not disclose the fact that the decedent had been treated at Charity Hospital in New Orleans on numerous occasions between March, 1957 and July *205 29, 1961, the latter being the date the application was made. Decedent had a history of grand mal type of epilepsy of 14 years duration, and also for prostatic disorders and complaints of blood in the urine. The records and the testimony of Dr. Paddison reveal that decedent was treated at the hospital in March, April and May of 1957 for blood in the urine requiring subjection to intravenous pyelograms, numerous tests, and prostatic massage. The medical records further show decedent underwent continuous treatment in the Neurology Department at the hospital during a period extending from April 4, 1961 through October of 1961 for recurrent and frequent convulsive episodes. Decedent informed the physician he had been having convulsions since his discharge from military service in 1947. He experienced a convulsion on March 30, 1961 and was taken to the emergency room at Charity Hospital by his wife. The history then taken shows that like seizures had occurred from twice a week to once a month. After a complete examination and work-up, including blood and urine studies, X-rays of the chest and skull and electroencephalograming he was told to return in three weeks. There was a reexamination on April 25, 1961 and it was learned by physicians at this time that he had suffered two seizures since his last examination. Medication was prescribed and the patient was directed to bring his wife along with him for the next examination. On May 23, 1961 the decedent returned to the Neurology Department accompanied by his wife stating at that time that there had been a seizure since his last visit. The wife described the seizure and the physicians recognized it as a typical grand mal seizure with tonus, clonus, incontinence, salivation and tongue biting. More medication was prescribed and decedent was admonished to return in three months. Before their next visit to Charity Hospital decedent and his wife applied for the policy sued upon. On August 1, 1961 only three days after the application for the policy decedent again went to the hospital. He went twice in August, 1961, twice in September and finally in October, 1961 he was admitted to a ward for extensive treatment after which he was discharged with the final diagnosis of idiopathic epilepsy.
Dr. Atherton a urological surgeon and medical director of defendant insurance company testified that had he known of the urological symptoms the company would have required more information from Charity Hospital concerning the blood in the urine and the reasons for the symptoms in order to determine whether to accept the risk. Dr. Atherton stated that epilepsy is very significant from a medical underwriting standpoint and it is not the insurer's practice to accept epilepsy patients either on a standard or substandard basis. The decedent would have been rejected because of the grand mal attacks.
The trial judge in his reasons for judgment stated, "It is the opinion of the Court that the facts of this case clearly indicate that the false statements made by the decedent and the beneficiary were made with actual intent to deceive. Further, that the false statements materially affected the acceptance of the risk and the hazard assumed by the insurer" and we agree.
The judge also wrote:
"The witness, Mr. Vernon Martinez, agent of the defendant insurance company, told the truth.
"As to the plaintiff the court was not impressed with her testimony."
Counsel for plaintiff argues that the "no" answers to the medical questions were inserted by the agent although he did not ask all the questions and that out of 34 he only asked 2 questions in paraphrastic form. There is no objection to an insurance examiner paraphrasing the medical questions and it seems to us that a layman would be better able to understand the questions if couched in that form. See Radosta v. Prudential Insurance Co. of America, La.App., 163 So.2d 177. We concede, as counsel contends, *206 that where an agent assumes the responsibility for answering the questions asked in the application and answers falsely or incorrectly without the applicant knowing the manner in which they are answered the insurer will be estopped to claim that the representations were false or incorrect. This doctrine is too well settled to require citation of authorities.
But in this case there were questions propounded to both the insured and beneficiary which they answered falsely. Questions 10(a) and 29 were most pertinent and although only those two were actually asked we think truthful answers thereto would have disclosed and thus informed the insurer of the deteriorated condition of the decedent's health thus permitting the insurer to determine whether to issue the policy in light of the circumstances. The fact that an agent does not propound all of the health questions in an application for insurance does not excuse the giving of untruthful answers to questions actually propounded.
The Insurance Code of Louisiana LSA-R.S. 22:619(B) as amended provides:
"In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."
In Louisiana settled jurisprudence is to the effect that false representations in an application made for life insurance constitute ground for forfeiture of the contract if they relate to matters material to the risk; the test of materiality is whether knowledge of the facts would have influenced the insurer in determining whether to assume the risk or in fixing premiums. Roche v. Metropolitan Life Insurance Company, 232 La. 168, 94 So.2d 20; Lee v. New York Life Ins. Co. of New York, 144 La. 445, 80 So. 652; Kennison v. U. S. Letter Carriers' Mutual Ben. Ass'n., La.App., 132 So.2d 94; Flint v. Prudential Ins. Co. of America, La.App., 70 So.2d 161; Karno v. Metropolitan Life Insurance Company, D.C., 137 F.Supp. 893; 5 Cir., 242 F.2d 141; Rhodes v. Metropolitan Life Ins. Co., 5 Cir., 172 F.2d 183.
See, also 12 Appleman, Insurance Law and Practice, Section 7294, page 403, wherein it is stated:
"The most generally accepted test of materiality is whether or not the matter misstated could reasonably be considered material in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, or in fixing the premium rate thereon. * *"
Not only was the insured guilty of having made false statements as to his health but the beneficiary herself participated and abetted in such false statements being made. A beneficiary certainly cannot be allowed to reap the benefits of an insurance contract where she is a signer of the application and where she knew the decedent was in ill health and had failed to disclose material facts to the insurer. The settled jurisprudence of this state is to the effect that an insurer will not be held liable on a policy when its consent results from material fraudulently misrepresented which the beneficiary helped to make effective. Jacobs v. Metropolitan Life Ins. Co., La. App., 39 So.2d 346; Lucas v. American Bankers' Ins. Co., La.App., 141 So. 394.
Decedent did not die as the result of any of his physical ailments. The record shows that on July 15, 1962 he was killed by gun shot wounds in the chest not self-inflicted. It differs not whether the insured dies from a health condition about which a false representation was made in order for the false representation to be determined material to the risk. No causal connection *207 between the facts misrepresented and the death of the insured is necessary to establish the insurance company's claim of forfeiture of the policy. Roche v. Metropolitan Life Insurance Company, supra; Flint v. Prudential Ins. Co. of America, supra; Radosta v. Prudential Insurance Co. of America, supra.
We find no error in the judgment appealed from and it is accordingly affirmed.
Affirmed.