LOTTINGER, Judge.
This is a suit by petitioner, John Moel-ler, against defendant, American Casualty Company of Reading, Pennsylvania, hereinafter referred to as American, for benefits under a group accident and sickness policy issued by the defendant to petitioner’s employer, Field Enterprises Educational Corporation, hereafter referred to as Field. The Lower Court awarded judgment in favor of defendant and dismissed the action, and the petitioner has taken a devolutive appeal.
The evidence discloses that petitioner was employed by Field during about January of 1957 as a sales manager in the Seattle, Washington area. During October of 1963, petitioner was transferred by his company to New Orleans, Louisiana, as regional manager for Field for the territory consisting of the greater New Orleans area including Orleans, Plaquemines, St. Bernard and St. Tammany Parishes.
Petitioner continued to work actively for Field in his capacity as regional manager until February 1, 1965, on which day he was involved in an automobile accident as a result of which he sustained a whiplash-type of injury to his neck. Thereafter, he ceased his employment with Field and made formal claim to defendant for benefits under the group policy issued by them to Field and under which petitioner was afforded coverage. Following the lapse of the ninety day elimination period as provided in the policy, the defendant paid weekly accident indemnity benefits to petitioner in the amount of $164.38 per week for twelve weeks or until July 15, 1965, at which time the payments were terminated resulting in this law suit.
Petitioner makes his claim on either of two provisions of the policy issued by American, namely, the weekly accident indemnity or the weekly sickness indemnity. It was stipulated by counsel for both parties that if petitioner is entitled to any benefits under either of these provisions, such benefits would be in the amount of $164.38 per week for a maximum period of ninety-two weeks.
In its reasons for judgment, the Lower Court said:
“It is not seriously contended, and the Court cannot find that the accident caused the extended disability which the plaintiff claims. The accident itself produced only a temporary disability. The primary question presented to the Court is whether plaintiff is entitled to benefits under the sickness indemnity portion of *360 the policy. To this claim, defendant asserts three defenses. Because of the conclusion which the Court has reached, it is necessary that only one of these defenses be considered, and that is the defense that the policy requires that the disability resulting from ‘sickness’ commence while the policy is in effect as to the insured person.”
The policy with which we are concerned defines sickness as follows:
“ ‘Sickness’ as used in this Policy means sickness or disease causing disability commencing while this Insert is in effect as to the Insured Person, and is subject to the provisions, conditions and exceptions of the policy and of this Insert.”
From the above provision, it is readily apparent that it is necessary in order to afford coverage under the policy that the 'disability, if it exists, commences while the policy is in effect as to the person making a claim thereunder. It was stipulated by the parties that the policy became effective as to the petitioner on October 1, 1964. It is therefore necessary to review the petitioner’s prior medical history to determine whether his alleged disability commenced before or after the issuance of the policy. It is also important to note that the sickness which plaintiff alleges caused his disability was a loss of sight coupled with hypertension which made it impossible to do the driving necessary to perform his employment with Field.
The record shows that petitioner entered the Navy as a commissioned officer on May 4, 1942. On January 1, 1953, he was separated from active service on a disability discharge because of the fact that he was then suffering from hypertension. At the time of his discharge his disability was fixed at ten per cent. Petitioner subsequently sought an increase in the disability percentage but the record does not reveal that he was successful in this venture.
During the year 1957, petitioner began his employment with Field while he was residing at Seattle, Washington. During the year 1960 while still in Seattle, petitioner consulted a Dr. Thomas as he was suffering with a bout of flu. During the course of the doctor’s examination, it was discovered that petitioner had cataracts forming on his eyes. He then consulted Dr. Barrett, an ophthalmologist, who confirmed the fact that he was suffering with cataracts in both eyes, the one to his right eye being more pronounced.
Dr. Barrett treated plaintiff periodically until the latter part of 1962 when his eyes got worse. On January 16, 1963, Dr. Barrett operated and removed the cataract from petitioner’s right eye. Afterwards, the doctor fitted petitioner with a contact lens, however, petitioner still had blurred vision. Dr. Barrett advised him that he had suffered a hemorrhage of the right eye and this was producing part of his difficulties.
As stated previously, petitioner was transferred by Field to New Orleans during September, 1963, and shortly thereafter moved to Covington, where he continued his employment as regional manager for the New Orleans area. However, he continued to have difficulty with the irritation in his right eye. In March, 1964, he consulted Dr. Jacob Kety, a general practitioner in Covington, who referred him to the care of Dr. Bronstein, a specialist in ophthalmology who treated him from March until December, 1964. Dr. Bron-stein had died at the time of the trial of this matter, but Dr. Kety testified that, as a result of the consultation with Dr. Bron-stein, he recommended in December, 1964, that petitioner seek other employment. The recommendation of Dr. Kety was based on the fact that he felt that the eyesight difficulties were aggravating the hypertension. However, Dr. Kety does not say that this disability, which he felt required the petitioner to change jobs in December, 1964, did not occur until that time. In fact, his testimony indicates that his recommendation was made at that time simply because it was then, after petitioner *361 had consulted with several doctors, that he determined that petitioner was disabled.
Petitioner admits that after the operation in 1963 he continued to suffer with double vision, irritability of the eye and sensitivity to light, and these problems became more acute after he moved from Seattle to New Orleans because of the fact that, as he testified, there was more sunlight and glare in the New Orleans area than on the Pacific Northwest. When he visited Dr. Bronstein in March of 1964, he was experiencing extreme pain in his eye and a complete inability to see out of it. While still under treatment of Dr. Bronstein, petitioner, on August 18, 1964, consulted Dr. Shimek, the head of the eye department at Ochsner Clinic in New Orleans. At that time, he admittedly complained to Dr. Shi-mek about his inability to perform his job.
Dr. Shimek testified that he examined petitioner on August 18, November 13, 1964, and March 15, 1965, and that on the first visit petitioner was complaining of mucous in the right eye, difficulty keeping the right eye open, occasional pain in the right eye and difficulty with using the left eye because of the difficulty with the right eye. At this time the petitioner was wearing a patch over his right eye because without the patch he suffered double vision. Dr. Shimek found that petitioner had approximately normal vision or twenty over thirty plus two of the left eye, and, his testimony with reference to plaintiff’s vision in the left eye on August 18 and on the subsequent visits was as follows:
“Q. Now wearing this patch over his right eye, he would have no vision in his right eye. What would be the vision he had with his left eye?
A. Well, that would be the same as measured at the time of his examination, that is twenty over thirty plus two, at the initial examination and there was some variation from visit to visit. On November 13, 1964, it was twenty over twenty-five minus three corrected with his glasses in his good left eye and the same on March 11, 1965, twenty over twenty-five plus three. This is in the range of normal central vision and would be sufficient to qualify to drive and would be sufficient for reading small print and working and would be adequate for just about any ordinary working task or situation of everyday life.”
Now this testimony is important not because it refers to the disability of- petitioner, but to the fact that it shows that any disability he had with reference to his eyesight did not change from August of 1964 to March of 1965.
The Lower Court concluded from this evidence that any disability which petitioner suffered from his defective eyesight did not occur in December, 1964, nor at the time of his automobile accident in February, 1965. His eyesight got progressively worse from the time of his cataract operation and apparently in the spring and summer of 1964 had reached a stage where it might be said that it was creating its maximum disability effect.
The Lower Court thus found that whatever disability petitioner suffered from his defective eyesight commenced prior to the inception of the policy of insurance on October 1, 1964.
With regard to the question of hypertension, it was pointed out previously that petitioner had suffered from this disease for a number of years and had received a disability discharge from the Navy because of this condition. It is contended, however, by petitioner that this hypertension did not disable him from doing his work with Field until the strain of driving because of his defective eyesight started having a detrimental effect on his hypertension condition. Again the question is whether if this combination of events did create disability, *362 did this disability begin before or after October 1, 1964.
Dr. Kety, who was the family physician for petitioner, testified that he felt that petitioner’s failing eyesight was aggravating his hypertension. He testified that:
“* * * his blood pressure was very label. It wottld jump up and down without any provocation whatsoever, depending upon the amount of stress.”
Now it has already been concluded that Mr. Moeller’s defective eyesight reached its maximum disability at some time prior to October 1, 1964. It follows that the stress on petitioner caused by the defective eyesight would have reached its maximum prior to October 1, 1964. Thus there is no evidence in the record from which the Lower Court could reach any other conclusion than that the disability effects of the defective eyesight on the hypertension would have been present prior to October 1, 1964. The continued treatment by Dr. Kety for petitioner’s hypertension condition from March, 1964, until December, 1964, indicates the validity of this conclusion. Mr. Moeller was no more disabled in December of 1964 than he was in March of 1964. Although it was only then that Dr. Kety decided that the absolute last means of controlling petitioner’s blood pressure would have to be resorted to and that was a change of employment.
It is noteworthy that petitioner himself apparently considered this disability to have commenced prior to December of 1964. In a letter dated February 4, 1965, to Field Enterprises he made claim for disability benefits for loss of eyesight. He pointed out that,
“the specific trouble was loss of sight following an operation for cataracts, such loss due to a vascular insufficiency in the blood supply to certain areas to the retina. The exact date of this latter event is unknown to me, however, I have experienced difficulty for over 6 months.”
“* * * In as much as this disability has existed in excess of ninety days it is requested that the waiting period for benefits be considered met.”
Thus, we find that petitioner himself considered his disability to have commenced prior to December of 1964. Based upon the above mentioned facts, the Lower Court found that the petitioner was not entitled to benefits under the sickness indemnity provision of the policy, as the disability, if in fact there was such, pre-existed the coverage by the policy of insurance.
In support of the decision by the Lower Court, we believe it is important to point out certain findings by the medical experts that testified at the trial of this matter. Dr. Sam Nadler, an internal medicine expert, who is a professor in the .Tulane University Medical School, found upon his examination of petitioner that he was suffering from a mild hypertension or a raised blood pressure. He found the petitioner’s heart normal and found nothing to inhibit him from driving a car. Dr. Robert A. Shimek, an expert opthalmologist and who was serving as head of the eye department of Ochsner Clinic, saw petitioner on August 18, 1964, November 13, 1964, and March 15, 1965. He testified that the petitioner told him that he had been having trouble with his eyes since the operation of 1963 and had been wearing a patch over his right eye. Dr. Shimek found the left eye good and found no reason why petitioner could not drive unlimited distances for unlimited times.
Petitioner was also examined by Dr. Oliver H. Dabezies, Jr., a specialist in op-thalmology who saw him on August 22,1966. Dr. Dabezies testified that he could find no reason why petitioner could not drive a car for extended distances and times, however he was of the opinion that petitioner did have certain limitations in the areas of driving very fast and at high rates of speed because of some loss of depth perception, due to the sight of only one eye.-
*363 The evidence is therefore clear to the effect that the loss of eyesight in one eye as well as the hypertension which petitioner claims occurred prior to the effective date of the insurance policy with American. The evidence is also to the effect that there was no disability to petitioner in the performance of his duties with Field insofar as driving his automobile was concerned.
In support of his demand, petitioner has cited the case of Catchot v. Delta Life Insurance Co., La.App., 57 So.2d 919, 922, wherein the Court said:
“We concede that the policies may be interpreted either way, but it is our conclusion that, as the policies are written, and since they were written by the insurer and therefore any ambiguity or uncertainty should be interpreted against it, they create the impression that all that the insured need prove is that he has suffered the specific loss set forth in Schedule B, and that, when this proof has been offered, the burden shifts to the defendant to prove that, because of the particular provisions of the policy, there should be no recovery.
If this conclusion is antagonistic to the well established doctrine that, in cases involving accident policies, the burden is on the plaintiff to establish that the loss resulted from accident, then all we can say is that the policies involved here seem to justify the interpretation which we have placed on them, and we now hold that where a policy, in large type and as a part of the coverage, provides that a specific amount will be paid for a specific loss, and then, in much smaller type and in another paragraph headed ‘Provisions’, stipulates that the payment will be made only if the disease which causes the loss comes into being after the issuance of the policy, the burden is on the defendant to show that the disease was in existence before the policy was issued and that that same disease caused the loss.
We therefore conclude that defendant has not proven by a preponderance of the evidence that the loss was caused by a disease which antedated the policy and that, accordingly, the face value of each of the policies is due.”
Based upon the above case, petitioner contends that it is the burden of the defendant’s insurance company to prove, by a preponderance of the evidence, that the claim does not qualify under the provisions of the policy. We do not believe this contention to be supported by the jurisprudence of this state. As stated before, the term “sickness” under the policy is defined as «* * * sickness or disease causing disability commencing while this Insert is in effect as to the Insured Person * * * Under Section III of the policy, entitled “Weekly Sickness Indemnity”, the policy provides in part that “If sickness shall require regular attendance by a legally qualified physician and shall result in Total Disability of the Insured Person; the Company, commencing with the first day following the Elimination Period * * * periodically will pay indemnity at the rate of the Weekly Indemnity for Total Disability during the continuous period of such Total Disability, but not beyond the Maximum Indemnity period * *
In the Catchot case (supra) the Court further said:
“It is well settled that the plaintiff must bear the burden of showing all facts required to bring the loss within the coverage of the policy, and it is equally well settled that the burden is on the defendant to show all facts which may be relied on where it is contended that, because of an exception or proviso in the policy, no recovery may be had.”
The specific loss claimed by petitioner is total disability. Petitioner has failed to sustain his burden to prove such loss. Furthermore, even were we to assume that such loss has been proven by a preponderance of the evidence, the defend *364 ant has effectively shown that such disability pre-existed coverage by the policy.
With regard to temporary disability of petitioner as a result of the accident, the policy of insurance in question provides that an insured person is entitled to benefits from accidental bodily injuries sustained while the policy is in force:
“* * * If sucj1 injllries shall within thirty days after the date of the accident, wholly and continuously disable and prevent the insured person from performing any and every duty pertaining to his occupation * * * not to exceed 104 weeks.”
Following the ninety day Elimination Period as specified in the policy, the petitioner was paid accidental benefits at the rate of $164.38 per week for a period of twelve weeks. The rate of the weekly benefits was computed in relation to the salary which the petitioner was then earning, and there is no question raised by the parties as to an incorrectness in these weekly amounts.
The only medical evidence which we have in the record relative to the injuries sustained as a result of the accident, and the resulting disability to petitioner, was the testimony of Dr. Kety. He testified that petitioner suffered from a whiplash-type of injury to his neck for which he wore a neck brace for a period of time and received therapy treatments. With regard to the disability, Dr. Kety testified as follows :
“Q. Well, approximately how long was Mr. Moeller totally and permanently disabled within the contracts of his whiplash and injuries received in the automobile accident?
A. Until about December of that year (1964) because he had to have maximum medical care but there wasn’t anything much more that we could do for him. For about six months he was, really, he couldn’t do a thing. We tried to iwean him away from his neck brace so we tried to take the neck brace off and he would have recurrence of the pain and would be back in and we would put the neck brace back on him. I felt around December of that year he had received maximum care. See, this medical treatment wouldn’t do him any more good but he had to learn to live with this. He had, unless it wore off or became fused or something with the arthritis.
Q. Approximately a year ?
A. Well, eleven months.”
We, therefore, find from the testimony of Dr. Kety that petitioner really couldn’t do a thing or was totally disabled, for a period of approximately six months following the accident. This would be within the time limit of the ninety day waiting period plus the twelve week period during which benefits were paid to petitioner. We really have nothing to show that petitioner was disabled following the sixth month, as a matter of fact, the record discloses some four months following the accident, petitioner was attending classes at the University of Alabama, and he was apparently making trips between his home in Coving-ton and the University.
Based upon the above facts, the Lower Court felt that there was no evidence of disability as a result of the whiplash suffered in the accident beyond the period of time for which petitioner has already been compensated. With this conclusion, we find no error.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, and all costs of this appeal to be paid by petitioner.
Judgment affirmed.