269 So.2d 507 (1972)
J. C. MURPHY
v.
CONTINENTAL CASUALTY COMPANY.
No. 9027.
Court of Appeal of Louisiana, First Circuit.
November 13, 1972.
*509 D. Bert Garraway, and Lawrence D. Sledge, Sledge, Garraway & Sleeth, Baton Rouge, for appellant.
David W. Robinson, Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, for appellee.
Before LANDRY, TUCKER and CUTRER, JJ.
LANDRY, Judge.
Plaintiff (Appellant) appeals a judgment rejecting his demand for $50,000.00 allegedly due him as beneficiary under a policy of health and accident insurance issued by defendant, Continental Casualty Company (Continental), covering Appellant's deceased wife, Helene M. Murphy. Pursuant to LSA-R.S. 22:657, Appellant seeks interest and attorney's fees due by virtue of defendant's failure to timely pay without just cause. Continental defended on the grounds (1) the policy was voided because of a willful misrepresentation of material fact in the application for insurance; (2) death was not "accidental" within the meaning of the policy provisions, and (3) if death was accidental, it was caused or contributed by disease, and therefore excluded from coverage. The trial court rejected Appellee's defense of misrepresentation, but dismissed Appellant's action upon finding that Appellant failed to prove the occurrence of an accident. The trial court also held that, assuming the occurrence of an accident, plaintiff failed to meet policy provisions requiring that death result directly and independently of all other causes, and was not caused or contributed to by sickness or disease. We reverse and render judgment in favor of plaintiff.
On September 28, 1966, Mrs. Murphy, then approximately 67 years of age, applied for subject policy which provided for benefits for injury defined therein as follows:
"Injury" means bodily injury caused by an accident . . . and resulting directly and independently of all other causes in loss covered by this policy. . . ."
An exclusionary clause expressly excludes from coverage "loss caused or contributed to by sickness or disease."
Question 5 of the application asks: "Have you been under observation or had medical or surgical advice or treatment during the past 5 years? (If `yes' state type of condition, dates, duration, results, name of *510 doctor and hospital.) The question was answered in the affirmative and the following explanation added: "Regular Check-up: Good Health".
Question 6 of the application inquires: "To the best of your knowledge and belief, are you now in good health and free from physical impairment or deformity? If `No' give full particulars?" It appears the "No" block was first checked, the check marked out, and the "Yes" block then checked. Defendant maintains the foregoing answers constituted misrepresentations of material facts inasmuch as decedent had considerable health problems in the preceding five years, which, had they been disclosed, would have resulted in rejection of the application for insurance.
The record discloses that as of the date of application and for many years previous, decedent was most active for a woman her age. She was daily engaged in the undertaking of hybridizing day lillies, in which endeavor she attained a degree of renown. With the aid of her maid of many years, decedent did all of the physical work necessary to raise and cultivate plants. She spent an average of 6 hours daily in her gardens, digging, planting and performing similar chores. She published a catalogue of lillies available for sale. She filled orders, packing and shipping lillies in response to mail orders from various parts of the country. She frequently attended flower shows, driving her own automobile to distant places, especially to attend day lilly conventions. In addition, she was active in church and music groups. It was because of her activities, especially her driving about the country that prompted decedent and appellant to apply for the insurance in question.
The record further discloses that decedent was suffering from mild to moderate hypertension or high blood pressure which condition antedated the application in question. For this condition, she sporadically took light medication prescribed by her son-in-law, Dr. J. S. Lucas. Although constantly reminded to take her medicine, the record discloses beyond doubt that decedent did so only when felt inclined. In 1962, decedent sustained a moderate whiplash as the result of an automobile accident. She was hospitalized for a period of about two days. The neck injury aggravated a pre-existing arthritic condition. It is conceded that in 1966, her arthritis had progressed to the point she had restricted neck motion. In addition, she had a single rather large gallstone of which condition she was aware. This condition, however, being a source of little discomfort, she rejected the suggestion that she have it surgically removed. Approximately 30 years ago, decedent underwent a spinal fusion to correct a vertebral problem. Despite this condition, her back caused her no particular problem.
On February 4, 1966, Dr. Lucas referred decedent to Dr. Charles S. Prosser, Internist, for medical evaluation mainly because Dr. Lucas felt the opinion of a non-related doctor would have more influence upon decedent, and Dr. Lucas desired to have her advised by a disinterested doctor to take her medicine regularly and lose weight. He felt this would lead to better control of decedent's difficulties which he deemed relatively minor for a person decedent's age.
Dr. Prosser testified in essence that he hospitalized decedent for a few days at Dr. Lucas' request. Decedent related a history of early morning fatigue. Decedent related she wanted to do things, but after a few hours exertion, she was tired out. Dr. Prosser noted some evidence of mild depression. His examination and elicited history revealed hypertension for which decedent was then taking mild medication. He also noted evidence of some deafness in the patient's right ear, mild generalized muscle and joint aching, moderate backache and fusion of the 5th, 6th and 7th cervical vertabrae with elimination of the intervening spaces. Dr. Prosser also noted the rather large gallstone which appeared to be causing the patient no particular distress.
*511 Dr. Prosser advised decedent to continue taking her medicine, and consider the possibility of having her gallstone removed, otherwise for decedent to conduct herself in her normal manner which he felt she could do. At Dr. Prosser's request, decedent returned for a follow up visit on February 17, 1966, at which time the patient was advised to lose weight.
The testimony of Dr. Lucas, plaintiff, Mrs. Barbara Murphy Lucas (decedent's daughter), and decedent's maid, Pinkie Johnson, leaves not the slightest doubt but that decedent was a staunchly independent individual who complained very little, if at all, and who did not consider herself ill enough to take medicine.
After her hospitalization by Dr. Prosser, decedent returned home with the attitude that she was in good health, and that Dr. Lucas was an alarmist in referring her to Dr. Prosser. Upon her return home, decedent continued her usual activities until she suffered a stroke in 1968. Following the stroke, decedent's condition worsened. She began experiencing episodes of spontaneous projectile type vomiting, the materiality of which will appear in our subsequent discussion of the question of whether her death was accidental within the terms of the policy.
In essence, plaintiff testified that at the time the policy was applied for, both plaintiff and decedent considered decedent to be in good health. Plaintiff explained that he did so largely as the result of Dr. Prosser's diagnosis and advice that decedent continue her routine activities. He added that at that time decedent was as active as usual and made no complaints regarding her physical condition. Plaintiff stated that he and decedent explained decedent's past medical history to defendant's representative who filled out the application, and decedent then affixed her signature. Examination of the application reveals that the questions thereon were filled out in a handwriting different from decedent's signature. Defendant's representative, Mr. T. B. Beale, Jr., did not appear as a witness. It is stipulated, however, that if Mr. Beale were called to testify, he would state that he did not fill out the application.
It is clear from the testimony of defendant's underwriter, Skomra, that had plaintiff's true medical history been known, the application would have been rejected.
Based on the foregoing testimony, the trial court concluded the application contained misrepresentation of material facts, but that defendant failed to establish fraud or intent to deceive on the part of decedent, and declined to avoid the policy for fraud.
Subject policy provides that "After two years from the date of issue . . . no misstatements except fraudulent misstatements. . . shall be used to void the policy or to deny a claim. . . ."
The law presently governing the effect of misrepresentation in instances of this nature is found in LSA-R.S. 22:619(B), which reads as follows:
"B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."
Defendant concedes that two lines of jurisprudence have evolved in the interpretation of the applicable statute, namely, one to the effect that materiality of a misstatement standing alone is sufficient to bar recovery; the other holding that both intent to deceive and materiality must be established for the insurer to avoid liability. In so contending, defendant relies upon Roche v. Metropolitan Life Insurance Company, 232 La. 168, 94 So.2d 20, which held that *512 misstatements of material fact suffices to avoid a policy, irrespective of an absence of intent to deceive.
We note, however, that subsequent to Roche above, the Supreme Court decided Gay v. United Benefit Life Insurance Company, 233 La. 226, 96 So.2d 497. In Gay, above, the Court reviewed the jurisprudence which interpreted the source provisions of LSA-R.S. 22:619(B), and held that the prior statutes required both intent to deceive and materiality in order that a misrepresentation effectuate an avoidance of a policy. The court in Gay, then concluded that LSA-R.S. 22:619(B) was but codification of the prior jurisprudence. On this basis, Gay, above, held that the disjunctive "or" contained in Section 619(B), above, in fact means the conjunctive "and". Gay also contains the following significant language:
"After the 1906 act, as well as subsequent to the 1916 statute, this court interpreted such language to mean that incorrect statements in an application would not vitiate the policy unless they were wilfully made with an intent to deceive and were material to the risk. (Citation of authorities omitted.)

* * * * * *
"And after a careful reading of the cases in which the preexisting law was interpreted and applied we are convinced that the codifiers, with reference to the provisions in question (LRS 22:619B), were merely attempting to express the courts' holding to the effect that in order to vitiate a policy a misstatement must have been made fraudulently or with the intent to deceive,that is (or), knowing it to be untrue and believing it to be material to the risk (or of such nature that it would be only reasonable to assume that he must have believed that it was material)."
Following Gay, our own court decided Knight v. Jefferson Standard Life Ins. Co., La.App., 205 So.2d 485. Knight observes:
"Thus, it can be seen that the Gay decision interpreted the above statute and construed the disjunctive word "or" in R.S. 22:619(B) to mean "and", therefore making it necessary that the insured not only make a material misrepresentation but that he must also make it with an intent to deceive."
Defendant maintains that Gay does not change the rule established in Roche. We disagree on the basis of the hereinabove quoted language from Gay which was followed in Knight, above. Defendant also relies upon Lentz v. Metropolitan Life Insurance Company, 5 Cir., 428 F.2d 36, which held that our jurisprudence is established to the effect that strict proof of fraud is not required in instances of this nature. We note that this holding in Lentz is not supported by citation of any authority. Nevertheless, we are in accord therewith because of the obvious difficulties encountered in proving one's actual intent.
We are also in agreement with Lentz, above, insofar as that decision follows Gay, above, in recognizing that the essential element of intent to deceive must be determined in the light of the attending circumstances, including the insured's knowledge of the falsity of the statement and his belief of the materiality thereof, or the existence of circumstances from which it may be reasonably assumed the insured must have believed the statement to be material.
We find nothing in the record to support the claim that decedent knowingly made false statements believing them to be material, or that the circumstances were such it may be reasonably assumed decedent must have believed such statements to be material.
In stating that her hospitalization was for regular checkups, we find it abundantly clear decedent did not knowingly misrepresent the purpose thereof. Dr. Lucas' *513 testimony is to the effect he indicated to decedent that he wished to have her checked by another doctor. Upon leaving the hospital, decedent was instructed by Dr. Prosser to resume her regular routine, but to lose a little weight and take her medicine regularly. The record is also clear that following her hospitalization, decedent did in fact resume her former activities.
As regards the statement she was in good health, we conclude decedent did not knowingly misrepresent the state of her health. While decedent must undoubtedly be charged with knowledge of the fact that she had a slightly elevated blood pressure, and was suffering to some extent with restriction of her neck and back, the record leaves not the slightest doubt but that decedent considered herself to be in good health for a person her age. She continued her usual activities despite deficiencies which to her were of a minor nature and a source of mild aggravation. In this regard, it is worthy of note that both Dr. Lucas and Dr. Prosser considered decedent's hypertension to be mild and easily controllable. Additionally, the clear import of both doctors' testimony is that decedent was in reasonably good health for a person her age.
We find nothing in the record to indicate that decedent knowingly failed to disclose her hospitalization for treatment of injuries sustained in an automobile accident four years before the date of the application in question. Nor do we find any evidence to support the claim that decedent believed such information to be material or that the circumstances were such that it may be reasonably assumed decedent must have known of the materiality of this particular information. We so hold because the record discloses decedent's injuries in the accident were relatively minor, her chief complaint being a mild whiplash. Admittedly decedent suffered mild discomfort and some limited motion of the neck as a result of this injury and its aggravation of her pre-existing arthritic condition. Nevertheless, neither decedent nor Dr. Lucas considered decedent's neck problem to be of any serious consequence. Decedent received no treatment for this condition, and it did not in the least deter decedent from performing her usual activities. We conclude that although decedent knew she had some problems with her neck, she, in all good conscience, believed it to be a trivial matter. Considering decedent's age, medical history, and all other pertinent circumstances, we conclude it may not be reasonably assumed decedent must have believed knowledge of her hospitalization following the automobile accident was material to the insurer.
In 1968, Mrs. Murphy suffered a mild to moderate stroke followed by a decline in health. She developed an uncontrollable appetite, and experienced fairly frequent episodes of mild, projectile type vomiting spells. As Dr. Lucas and other witnesses explained, decedent would simply open her mouth and it all came up, and then she was ready to eat again. On occasion the disgorged stomach contents would travel a foot or two, hence the description of her condition as a projectile type vomiting. It further appears these episodes were involuntary and not associated with or preceded by coughing, gagging, retching, or any other form of violent bodily reaction.
Mrs. Murphy died September 4, 1969, of pneumonitis and mediastinitis (inflamation of the mediastinum) which resulted from a ruptured esophagus which was in turn caused by a violent coughing, gagging and choking spell, followed by severe vomiting. Appellant contends this episode resulted from decedent's choking on a partially chewed plum which lodged in decedent's esophagus, thereby resulting in an accident. Defendant urges that the incident was directly related to decedent's deteriorated physical condition and past history of spontaneous vomiting, and was not accidental. Additionally, defendant contends the vomiting which produced the ruptured esophagus was a normal bodily function, *514 consequently, if the death were accidental, it was within the policy exclusion which did not extend coverage to death resulting from sickness or disease.
On August 26, 1969, decedent ate lunch at noon consisting of steak and rice with watermelon for dessert, served by her maid, Pinkie Johnson. She then retired to her bedroom for a rest. At approximately 2:30 P.M., decedent obtained a plum from her kitchen, prepared it for consumption, and returned to her adjacent bedroom with the plum in a saucer. Shortly thereafter, the maid, who was in the kitchen, heard decedent choking and making loud gasping and gagging sounds. Decedent coughed up the partly chewed plum, and immediately began vomiting violently.
Pinkie Johnson testified that upon hearing decedent cough and gag, she rushed to decedent's room and found decedent attempting to "get something up". She sped to the kitchen, obtained a dishpan, and returned to decedent who continued coughing and gagging violently until she eventually coughed up the plum which "jumped out into the pan". Mrs. Johnson noted the plum was bloody when coughed up. Thereafter decedent began to vomit her stomach content. The witness removed the plum from the dishpan and saved it to show Dr. Lucas. She estimated the size of the chewed plum at about that of a small pullet egg. She also noted that decedent had removed the seed from the plum and placed it in the saucer beside decedent's bed. She explained that all prior vomiting episodes which she had witnessed occurred instantaneously with no warning, and were unaccompanied by prior coughing or gagging. In short, she testified she had never before seen decedent cough and gag while experiencing a vomiting spell.
Dr. Lucas testified that upon being summoned to decedent's aid, he found her in shock and obviously very ill. He was shown the plum bolus (a mass of chewed food ready to be swallowed), which he noted to be partly chewed and bloody, but which gave no indication of having been partly digested. Thinking decedent was suffering from an ulcer, he ordered her immediate hospitalization, and summoned Dr. Millard E. Byrd, to whom he referred patients for abdominal surgery. He did not suspect a ruptured esophagus which condition was relatively uncommon in his experience. Dr. Lucas was of the view the rupture of the esophagus occurred during the period of retching, gagging and coughing experienced by decedent before she coughed up the plum. He based this conclusion on the fact that the dislodged plum was bloody, that decedent vomited blood after dislodging the plum, and that decedent was in shock when he arrived.
Dr. Millard E. Byrd, General Surgeon, stated that decedent died of pneumonitis and mediastinitis resulting from a tear in her stomach at the junction of the esophagus. He explained that the complete rupture, which he found relatively rare, caused a leakage of fluid into the chest mediastinum resulting in inflammation of the mediastinum. He conceded that most such ruptures are due to trauma, but that such a tear could result from violent retching and vomiting which he termed a Mallory-Weiss syndrome. He attributed decedent's tendency to vomit to her hardening of the arteries and overeating. Dr. Byrd also stated that lodging of a foreign body in one's esophagus could precipitate vomiting and described vomiting as a natural, normal bodily process by which the body seeks to expel a harmful, nauseous or noxious substance that is either present in the stomach or lodged in the esophagus. In Dr. Byrd's opinion, the rupture resulted from decedent's retching, coughing and gagging in an effort to disgorge the lodged plum. He also stated it would take a much more violent and protracted or prolonged episode of vomiting to tear the esophagus than that described to him as being the type of vomiting ordinarily experienced by decedent in her prior episodes.
Decedent was also attended by Dr. Page W. Acree, thoracic surgeon. He confirmed *515 the diagnosis of a rupture of the lower third of the patient's esophagus resulting in admission of a purulent fluid into the pleural space contaminating both the mediastinum and pleural space. He attributed the rupture to the vomiting episode related to him, and also concluded that the ensuing pneumonitis and mediastinitis resulted directly from the ruptured esophagus. Dr. Acree also stated that lodgment of a foreign body in the esophagus could precipitate the type of vomiting required to rupture one's esophagus. He described the complete rupture of an esophagus as an uncommon occurrence despite his having encountered several such cases over the preceding 15 years of his practice.
Appellant contends the trial court erred in finding that Appellant failed to establish that the death was accidental because Appellant failed to prove that the gagging, retching and ensuing vomiting, which caused the rupture of decedent's esophagus, resulted from the lodging of the plum bolus in decedent's esophagus, upon which premise Appellant's claim is admittedly predicated. In so concluding, the trial court noted decedent's prior history of spontaneous vomiting, the fact that the seed had been removed from the plum, and the additional circumstance that there was no evidence of a penetrating wound. Appellant also contends the lower court erred in holding that, assuming an accident, recovery was barred under the exclusionary clause. Finally, Appellant suggests the lower court erred in failing to shift to defendant the burden of establishing the exclusionary defense that death was caused or contributed to by sickness or disease.
The pertinent parts of subject policy read as follows:
". . . promises to pay indemnity for loss resulting from injury . . .

DEFINITIONS
Injury means bodily injury caused by an accident sustained by the Insured while this policy is in force as to the insured and resulting directly and independently of all other causes in loss covered by this policy, . . .

PART V EXCLUSIONS
This policy does not cover any loss caused by or resulting from: . . . (5) loss caused or contributed to by sickness or disease."
Defendant correctly maintains the burden is upon plaintiff to show that death resulted from an accident, directly and independently of all other causes, as required by the above quoted policy provision. It is defendant's position that "directly and independently" are words of coverage, not exclusion, and that Appellant has failed to prove his case because there is a total lack of evidence of traumatic injury. According to defendant, our jurisprudence has evolved the rule that in interpreting the term "accident", the means or cause of the injury producing incident are not separated from the result, and if the means or cause of the injury is an intentional act, the resulting injury is not accidental. In so contending, defendant relies upon Schonberg v. New York Life Insurance Company, 235 La. 461, 104 So.2d 171; Boasso v. State Farm Mutual Auto Insurance Company, La.App., 246 So.2d 696. Defendant also argues, on authority of Towner v. Prudential Insurance Company of America, La.App., 137 So.2d 449, that proof of sudden trauma or consumption of a noxious or harmful substance is required to establish an accident. On this basis, defendant contends the plum bolus swallowed by decedent was not noxious or harmful; that the bolus was where it was supposed to be, namely, in the esophagus; that the normally sized and textured bolus was only incidental in precipitating the vomiting, and that the rupture was caused by the vomiting which is a normal bodily function. Defendant also argues that if the bolus was too large and not well chewed, and thus became lodged and caused the vomiting, the primary cause of the vomiting would be the intentional ingestion of the bolus, and *516 therefore not accidental. Alternatively, defendant maintains that if the rupture be deemed accidental, the accident was caused or contributed to by decedent's physical condition, especially her history of spontaneous vomiting, and the accident falls within the exclusionary clause.
Based on the testimony of Pinkie Johnson, Appellant claims an accident did occur in that the plum bolus lodged in decedent's esophagus, and precipitated the violent gagging, gasping and vomiting which resulted in the rupture in question. Appellant contends that Schonberg v. New York Life Insurance Company, 235 La. 461, 104 So.2d 171, defines accident as an incident occurring under such circumstances that the average individual would regard the resulting loss so unforeseen, unexpected and extraordinary that he would consider the incident an accident. According to Appellant, Schonberg, above, also holds that a loss may be due to accident even though the means or cause be intentional or within the ordinary course of affairs. Appellant maintains a ruptured esophagus is not a normal occurrence, and is so unforeseen, extraordinary and unexpected that an average individual would consider such an occurrence an accident. Appellant further suggests that decedent's physical condition did not lend itself to the probability of a ruptured esophagus, but rather the rupture was occasioned by the violent coughing, gagging, retching and vomiting caused by the lodging of the plum bolus. On authority of Carnes v. Continental Casualty Co., La.App., 212 So.2d 441, Appellant next contends that the phrase "resulting directly and independently of all other causes" means the burden is on Appellant to show that the accident was the predominant cause of loss, and in this respect, the record establishes that a ruptured esophagus was the cause of death. Citing Lafield v. New York Life Insurance Co., La.App., 9 So.2d 248, Appellant claims the burden rested upon defendant to establish that the gagging, retching and vomiting was occasioned by decedent's existing illness. In this respect, Appellant urges that defendant has failed because the nature of the vomiting episode in question was vastly different from decedent's prior spells. Finally, Appellant maintains that even though decedent's illness contributed in some manner to her death, plaintiff was only required to show, and did show, that but for the accident, death would not have occurred when it did, as held in Richard v. Southern Farm Bureau Casualty Ins. Co., La.App., 128 So.2d 806; Lipscomb v. Equitable Life Assur. Soc. of United States, 205 La. 738, 18 So.2d 167.
All of the foregoing contentions may be summarized in three queries, namely, was there an accident; if so, was it the cause of death directly and independently of all other causes, and was the death caused or contributed to by sickness or disease?
We find that the main thrust of defendant's position is based on the erroneous premise that, to constitute an accident, it must be shown that the loss resulted from an unintended traumatic means. Such a requirement does not exist under our law as set forth in Schonberg, above, which case involved a death resulting from anaphylactic shock following a transfusion of a very rare blood type. The policy provisions involved in Schonberg were very similar to those involved in this instance. Anaphylactic shock was defined as an extremely rare reaction occasioned by a prior unpredictable sensitization of the patient to some component of blood used in the transfusion. It was argued in Schonberg that although the shock was an unforeseen and unexpected result, the means (the transfusion) was intentional, consequently there was no accident. In Schonberg, the Court exhaustively reviewed the jurisprudence of our own and other states which exclude from coverage accidental losses which are merely the results of intentional acts. In rejecting the rule previously established by our own Parker v. Provident Life & Accident Ins. Co., 178 La. 977, 152 So. 583, Schonberg states:
"Because of such doubts as to the validity of a distinction between injury *517 by accidental means and injury as an accidental result, as the above-cited treatises and annotations recognize, there is a growing minority of jurisdictions which prefer to construe a death resulting from bodily injury effected by accidental means as, simply, what in the ordinary language of laymen is considered to be an accidental death. `In an increasing number of jurisdictions, the distinction between the term "accidental means" and the terms "accident," "accidental result," "accidental injury," "accidental death," and the like, has been rejected or repudiated, and the terms are regarded as legally synonymous.' 166 A.L.R. 473.
"The rationale of the decisions in the jurisdictions rejecting or abandoning such a technical distinction is summarized in the Annotation 166 A.L.R. 469, at page 474. Basically, these decisions rely upon the principle that the terms used in an insurance policy should be construed in their ordinary and popular sense, and that any ambiguity therein should be construed in favor of the insured and against the insurer. As did the dissents above quoted, these decisions point out that death by accidental means and death as an accidental result are logically indistinguishable; that `if there is any question about the existence of an accident in either, there is the same question in the other; if there is an accidental result, there necessarily must have been an accidental meansthe two cannot logically be separated, for either there is no accident at all or there is an accident throughout,' 166 A.L.R. 474.

* * * * * *
"Rather than perpetuate the extremely technical distinction of the Parker case (so at variance with the usual rules of interpretation of insurance contracts utilized by Louisiana jurisprudence), which theoretically excludes from coverage accidental deaths that allegedly are only the `accidental results' of an intended act, we think it preferable to construe the present policy clauses in accordance with the common and usual significance attached by general and popular use to the language in question, LSA-C.C. art. 1946; so that, under these clauses, recovery is allowable for accidental death, whether or not the precipitating act which accidentally produces this fatality was itself voluntary and intended (subject, of course, to the other policy limitations.)
"In those jurisdictions which have, as we do now, repudiated the distinction between `accidental means' and `accidental results', the test `is whether the average man, under the existing facts and circumstances, would regard the loss so unforeseen, unexpected, and extraordinary that he would say it was an accident'"
Defendant's reliance in this instance upon Boasso v. State Farm Mutual Auto Insurance Company, La.App., 246 So.2d 696, as authority for the rule that an intentional means cannot result in an accident, is ill founded. In Boasso, the intentional application of automobile brakes with both feet brought about an intended sudden stop. In deciding Boasso, the Court applied the Schonberg rule, and found that the result was not unforeseen, unexpected or extraordinary. On the contrary, Boasso concluded that the result achieved was that intended. Schonberg and Boasso both stand for the proposition that in the determination of an accident, the result, namely, the loss occasioned, is the deciding factor. These authorities also hold that notwithstanding the means may be voluntary or intentional, whenever the results are such that an average person would deem them accidental under the circumstances, such results will be considered accidental.
Towner v. Prudential Insurance Company of America, La.App., 137 So.2d 449, relied upon by defendant for the proposition that absent traumatic means, there can be no accident, is clearly inapposite. The cited authority involved a policy insuring against "`. . . loss of life . . . effected solely through external, violent and accidental means.'" Death resulted from asphyxiation due to aspiration of vomitus. *518 The court found the cause of the vomiting to be associated with decedent's sore throat and tonsilitis; acute pharyngitis and gastroenteritis, which was not external. The Court distinguished Schonberg on the ground that in Schonberg the question of external means was not at issue. Subject policy does not require traumatic or external cause. We are of the view this matter falls squarely within the ambit of the Schonberg rule.
It is clear that decedent died of pneumonitis and mediastinitis resulting directly from the rupture of decedent's esophagus. We likewise find that the rupture was caused from the violent episode of gagging, retching and vomiting occasioned by decedent's attempt to ingest a partly chewed, deseeded plum. Therefore, we have the means, an episode of violent gagging, retching and vomiting, and the result, a ruptured esophagus. The issue, therefore, becomes was the result of such an unusual unexpected and extraordinary nature that the average person would consider it an accident?
We find that the result was so unusual, uncommon and unexpected it would unquestionably be considered accidental by the average man. In this conclusion, we are fortified by the testimony of the medical experts which is to the effect the rupture of an esophagus from vomiting is unusual, and that as a normal matter, vomiting does not produce such a result.
We next consider whether the accident caused the loss "directly and independently of all other causes", as required by the policy provisions. In this regard, it is settled law that plaintiff is required to show by a preponderance of evidence that the accident was the predominant cause of loss. Carnes v. Continental Casualty Co., La.App., 212 So.2d 441. It suffices to say that the medical testimony in this case establishes that the ruptured esophagus was the sole and predominant cause of the pneumonitis and mediastinitis which caused decedent's death.
There remains the issue of whether decedent's death was caused or contributed to by sickness or disease. The rule, as regards this issue, is that to defeat recovery, sickness or disease must be established as the predominant cause of death. Moreover, if an injury aggravates an existing illness or disease, thereby accelerating the death of the assured, death is held to result directly and independently of all other causes. In other words, if death would not have occurred when it did but for the injury resulting from the accident, it was the direct, independent and exclusive cause of death at that time, even though death was hastened by the diseased condition. Lipscomb v. Equitable Life Assur. Soc. of United States, 205 La. 738, 18 So.2d 167, and authorities cited therein.
It is settled law that upon plaintiff establishing death resulting from an accident or accidental means, the burden shifts to the insurer to show that the loss falls within the exclusionary clause. Moeller v. American Casualty Co. of Reading, Pa., La.App., 230 So.2d 358; Lafield v. New York Life Ins. Co., La.App., 9 So.2d 248. When Appellant established that the ruptured esophagus resulted from an accident, it became defendant's duty to prove that illness was the predominant cause of death, namely, that without the injury, death would have occurred when it did due to illness or disease. Not only did defendant fail to establish that death resulted when it did from illness or disease, the record clearly shows the contrary. The evidence is overwhelmingly to the effect that the nature of the vomiting spell in question was entirely different from those normally experienced by decedent. Decedent was never before known to cough or gag preceding such incidents. The record reflects that normally, decedent would merely open her mouth and with no effort whatsoever to force food out, she would disgorge her stomach content. It also appears that the normal episodes experienced by decedent were most unlikely to cause a ruptured esophagus since they were unaccompanied by violent *519 gagging, retching, coughing or forcible attempts to vomit. The testimony indicates the vomiting in this instance was caused by decedent's trying to forcibly dislodge a partially chewed plum. It was Dr. Acree's opinion that the retching most probably caused the rupture. We find that but for the accident, decedent would not have died when she did from her illnesses.
Appellant's claim for interest and attorney's fees, based on defendant's alleged arbitrary failure to pay upon Appellant's submitting due proof of loss, pursuant to LSA-R.S. 22:657, is denied. Under the circumstances, we find that defendant had just cause to decline payment.
It is ordered, adjudged and decreed that the judgment of the trial court rejecting Appellant's demands be and the same is hereby reversed and set aside, and judgment rendered herein in favor of plaintiff, J. C. Murphy, and against defendant, Continental Casualty Company, in the full sum of $50,000.00, together with legal interest thereon from date of judicial demand, until paid; defendant to pay all costs of these proceedings.
Reversed and rendered.