Mrs. Addie **RAYFORD**, widow of Henry
W. Batiste, Plaintiff,

v.

**NEW YORK LIFE INSURANCE
COMPANY, Defendant.**

Civ. A. No. 70–2266.

United States District Court,
E. D. Louisiana.

May 8, 1973.

**140**

James F. Mulla, Jr., New Orleans, La., for plaintiff.

Eugene R. Preaus, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

CASSIBRY, District Judge:

This case involves a $17,000 life insurance policy issued by the insurer, New York Life Insurance Company, to decedent, Henry Batiste. Upon Mr. Batiste's untimely death from an acute heart attack, his widow sought to recover the benefits of the policy from New York Life. The insurer refused to make payment, claiming that in filling out the pre-policy physical the decedent had given materially false answers to a number of questions, with the intent to deceive the insurer, so that the policy was void. *See, e. g.,* Gay v. United Benefit Life Ins. Co., 233 La. 226, 96 So.2d 497 (1957). First Federal Savings & Loan Ass'n v. National Old Line Ins. Co., 254 So.2d 497 (La.App. 3d Cir. 1971); Lane v. Life Ins. Co. of Virginia, 176 So.2d 202 (La.App. 4th Cir. 1965).

The applicable law with respect to this insurance defense is set out in LSA–R.S. 22:619:

A.   Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.

B.   In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive *or* unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer. (emphasis added)

The burden of pleading and proving this defense is on the insurer. First Federal S & L Ass'n v. National Old Line Ins. Co., 254 So.2d 497 (La.App. 3d Cir. 1971).

The interpretation of this statute has caused no small amount of confusion in Louisiana jurisprudence. The language of Section 619(B) seems clear enough, and appears to give an insurance company a defense *either* when the applicant made a false statement with "actual intent to deceive" *or* when he made such a statement and it "materially affected either the acceptance of the risk or the hazard assumed by the insurer," without regard to the insured's intent to deceive. A number of Louisiana decisions have adopted this position Pearce v. Union Bankers Life Ins. Co., 259 So.2d 81 (La.App. 1st Cir. 1972); Lane v. Life Ins. Co. of Virginia, 176 So.2d 202 (La. App. 4th Cir. 1965); Lamark v. Lincoln Life Ins. Co., 169 So.2d 203 (La.App. 4th Cir. 1964); Radosta v. Prudential Ins. Co. of America, 163 So.2d 177 (La. App. 4th Cir. 1964).

But while the language of the statute would seem to require that an insurance company be afforded two distinct defenses on the basis of false statements, the Supreme Court of Louisiana held

otherwise in the landmark decision of Gay v. United Benefit Life Ins. Co., 233 La. 226, 96 So.2d 497 (1957). In *Gay*, the Court reviewed the jurisprudence which interpreted the source provisions of the present Section 619(B) and held that prior statutes had required both intent to deceive and materiality in order that a misrepresentation effectuate an avoidance of the policy. The Court in *Gay* then concluded that Section 619(B) was only a codification of this prior jurisprudence; and on that basis it held that the disjunctive "or" in Section 619(B) in fact means the conjunctive "and." The great preponderance of authority in the Louisiana inferior courts subsequent to the *Gay* decision have adhered to its rationale. *See, e. g.*, Murphy v. Continental Cas. Co., 269 So.2d 507, 511–513 (La.App. 1st Cir. 1972); Bamburg v. Reserve Life Ins. Co., 259 So.2d 408, 410 (La.App. 2d Cir. 1972); First Federal S & L Ass'n v. National Old Line Ins. Co., 254 So.2d 497, 499 (La.App. 3d Cir. 1971); Hendricks v. Connecticut General Life Ins. Co., 244 So.2d 249, 250–251 (La.App. 3d Cir. 1971); Knight v. Jefferson Standard Life Ins. Co., 205 So.2d 485 (La.App. 1st Cir. 1967); Fruge v. Woodmen of World Life Ins. Society, 170 So.2d 539, 543 (La.App. 3d Cir. 1965). The leading federal authority on this subject, Lentz v. Metropolitan Life Ins. Co., 428 F.2d 36 (5th Cir. 1970), has adopted the majority approach embodied in the above-cited cases as the proper one for *Erie* purposes,[1] and I believe that it is proper to follow it here.

In this case then, the insurance company has the burden of showing that in applying for the policy of insurance at issue, the decedent (1) made a false statement (2) which was material to either the acceptance of the risk or the hazard assumed by the insurer, and (3) which was made with intent to deceive the insurer. To discharge its burden as to intent, the insurer need not prove actual fraud on the part of the insured. Murphy v. Continental Cas. Co., 269 So.2d 507 (La.App. 1st Cir. 1972); Lane v. Life Ins. Co. of Virginia, 176 So.2d 202 (La.App. 4th Cir. 1965). It is enough, in the words of *Gay*, *supra* that the insured made the statement "knowing it to be untrue and believing it to be material to the risk (or of such a nature that it would only be reasonable to assume that he must have believed it was material)." 96 So.2d at 499. This determination is to be made in light of all the attending circumstances on a case by case basis. *Murphy, supra* at 269 So.2d 512; Lentz v. Metropolitan Life Ins. Co., 428 F.2d 36 (5th Cir. 1970).

■ The facts, as developed in the trial held before Judge Comiskey, are these. The defendant's agent, Mr. Vybiral, went aboard plaintiff's vessel to solicit business among the crew. Plaintiff, among others, indicated his willingness to purchase a policy, and a Dr. Centanni, who regularly performed pre-insurance physical examinations for the defendant, was summoned aboard the vessel that same afternoon by Mr. Vybiral. Dr. Centanni examined the decedent and asked him a number of questions concerning his past medical history. This entire procedure, according to Dr. Centanni, consumed about forty-five minutes.

Among the questions asked by Dr. Centanni and answers given by decedent[2] were the following:

QUESTION 2(b): Have you ever consulted a physician or practitioner

---

1. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Fifth Circuit in *Lentz* suggested that the conflict between these two lines of cases may be "more imagined than real, for all of the [material-misrepresentation-alone-suffices] cases contain some element of bad faith on the part of the insured," which would allow the insurer to prevail under the more stringent standard of proof required by *Gay*, 428 F.2d at 40.

2. These "answers of the decedent" are actually Dr. Centanni's rendition of Mr. Batiste's responses. Mr. Batiste did read and sign the medical history at the close of the interview, however, and its accuracy is not challenged here.

for or, so far as you know, ever had or been treated for rheumatic fever, heart murmur, heart attack, angina pectoris, stroke, chest pain, shortness of breath, palpitation, irregular pulse, elevated blood pressure, varicose veins or any other disorder of the heart or blood vessels?

ANSWER: No.

QUESTION 3(c): Have you within the last 5 years, had any x-ray, electrocardiogram or other diagnostic procedure ordered by a physician or practitioner?

ANSWER: Yes. General check-up; x-ray of disc, EKG, etc. Found O.K.

QUESTION 4(c): Other than as stated in your answers to the preceding questions, have you, within the last five years, so far as you know, consulted any physician or practitioner for any reason, including routine or checkup examination?

ANSWER: Yes. 4–5 years ago: V. A. Hospital, N.O. [Also] Oct. 15, 1969: Browne-McHardy Clinic, 2223 Carondelet St., N.O., La. Simple physical exam—pre-employment for Lykes Bros. S.S. Co.

The evidence developed at trial, however, revealed that the decedent had entered the V.A. Hospital in February of 1967 for a period of about three weeks, complaining of chest pain and shortness of breath, and at that time his condition was diagnosed as due to hypertension and angina pectoris. In addition, Mr. Batiste was treated for hypertension on a number of subsequent occasions and had mentioned to his family that he had "high blood." Thus, the insurer argues, plaintiff had knowledge of his infirmities, but deliberately withheld this information from it. Failure to enumerate these conditions, defendant argues, was not only false, but also clearly material, because New York Life would not have issued any kind of a life insurance policy to Mr. Batiste had it known of just the hypertension, not to mention the angina pectoris. Thus, the defendant contends that it has met the requirements of Section 619(B) and is entitled to void the policy in question.

I believe that it is quite clear on the record before me that Mr. Batiste did make false statements to Dr. Centanni, and that these misrepresentations were material to the insurer's acceptance of the risk. But I do not think that these false statements were made with the intent to deceive the insurer, so that the policy defense must fail. In reaching this decision I am influenced by a number of factors which in their entirety convince me that the insured either was not aware of the omissions in his medical history at all, or else was unaware of their materiality, so that under Louisiana law he lacked the requisite intent to deceive. Gay v. United Benefit Life Ins. Co., 233 La. 226, 96 So.2d 497 (1957).

First, defendant's agent solicited the decedent aboard ship to sell insurance to him, or to any other seaman who might be interested. The decedent did not seek out the company. The entire transaction was negotiated and completed in less than a day, and it strains credibility to suppose that Mr. Batiste suddenly concocted a scheme to obtain insurance from New York Life that it might not otherwise have given him. The whole application process seems to have been completed in great haste—and the alacrity was occasioned not by Mr. Batiste but by the defendant—in an atmosphere conducive to innocent error or misrecollection.[3]

Second, the decedent declared all hospitals where he had been examined and treated and, further, gave the insurance company the right to check the records of these hospitals. Most probably, if decedent had intent to deceive, he would

---

3. At the trial, one Reverend Vincent Liberto testified that he had known the decedent over a fifteen year period and regarded him as an honest man. Mr. Batiste was in the habit of helping Reverend Liberto with light to moderately heavy work around the rectory. He performed these duties without complaint or apparent difficulty, and never referred to a heart condition or other ailment. (Tr. pp. 54–55)

not have disclosed this medical history so that the company might review his medical record. Especially this is so where the information the decedent did provide revealed that he had been subjected to x-rays and an electrocardiogram, which might well have alerted Dr. Centanni to the possibility that something more than a routine physical examination had been involved.[4] In this regard, the surrounding circumstances of the doctor going aboard ship for the examination and filling out the form himself must be considered. As the trial court judge observed, this examination was done with a certain amount of carelessness.[5] Finally, the decedent was a seaman and required a "fit for duty slip" from time to time. Since he was aboard ship and presumably fit for duty, he had every right to assume he was in good health.[6]

A third factor that must be considered is the decedent's background as an individual as reflected by the evidence. Such an evaluation shows that decedent went to sea at age sixteen and that he taught himself to read and write. His stepdaughter testified that he did not read and write well. It is certainly not unreasonable that a man of decedent's background would not have understood complicated medical terms such as "angina pectoris" or "elevated blood pressure" posed to him by Dr. Centanni, especially when these terms were presented to him as part of a long series of such words, which in turn were part of an even longer series of similarly complicated questions.[7]

4. Decedent's responses are completely consistent with a good faith effort on his part to recall as much as he could of a rather complex and confusing hospital stay. He revealed the major tests he had undergone and that he'd been "found O.K." This conclusion on his part was reasonable in view of the hospital records, which indicate that the decedent's angina pains were relieved within a week of entry and his hypertension brought within tolerable limits' shortly thereafter. Numerous daily entries on decedent's hospital chart bear such notations as "patient feels fine," "spent restful night," "no pain," and the like. Decedent's heavy smoking and drinking—obvious causes for his symptoms—were apparent to the medical staff, see note 8, infra; and his response to a controlled diet might well have prompted them to propound a highly optimistic prognosis to Mr. Batiste, one upon which it would have been justifiable for him to rely in view of his seemingly improved condition.

5. At the trial of this cause, Dr. Centanni testified that he read the various medical questions to decedent slowly and carefully, pausing after each possible illness to await a response. (Tr. pp. 77–78, 95) The judge who actually heard that testimony had this to say about it:

> I would think that the doctor going aboard the boat and talking to the man . . . [is] done with a certain amount of carefulness, but not with the very careful pruning that it's getting in the courtroom today. You know, all of this wording of these questions, I

would think that it's done a little more informal[ly] and each word is not dwelled upon and thought about like we are doing today in trying the case.

(Tr. pp. 132–33) I accord great weight to this contemporaneous observation by the trial judge in my attempt to unravel the factual issues in this case from the cold record.

6. The decedent's subjective impressions as to the state of his health are clearly relevant to whether he had the requisite intent to deceive New York Life. For a case where such considerations were decisive, see Murphy v. Continental Cas. Co., 269 So.2d 507, 511–512 (La.App. 1st Cir. 1972).

7. Dr. Centanni testified at length about what he thought Mr. Batiste meant by his answers to various questions. Pertinent excerpts follow:

> [Decedent said that he] went there [i. e., to the hospital] for a general checkup and when a patient tells me that, it only means one thing, he went there voluntarily, he had no complaint. . . . But now, I don't say he said that in those words, but he did give me the idea that he was not admitted to that hospital, he went there for a general checkup, he went for a routine examination.

(Tr. p. 79). But, as already discussed, Mr. Batiste's revelations are completely consistent with a full disclosure of all operative facts known to him. See note 4, supra. The decedent cannot be bound by Dr. Centanni's misinterpretations of

Finally, there appears to be a glaring gap in the proof of defendant's case on the issue of intent. What it appears to have demonstrated rather conclusively is that Mr. Batiste's *treating physicians* knew that he was suffering from conditions that would have prevented New York Life from issuing this policy. But Dr. John Tooman, the associate medical director and underwriter of defendant's company, testified that in reviewing decedent's entire medical record, there was no indication that *decedent* had ever been told he had high blood pressure or angina pectoris. Further, Dr. Tooman testified that the medical records indicate that decedent could have easily believed that he had nothing more than indigestion.[8] It should also be noted that both Dr. Centanni and Dr. Tooman testified that there are instances where patients are not told of their conditions for medical reasons. While the defendant could have eliminated this gap by calling one or more of Mr. Batiste's treating physicians it chose not to do so.

While each case must be judged on its own facts, it is useful, I believe, to compare the factual situation outlined above with one in which the insurance company's section 619(B) defense was successful. The following quotation is from Lentz v. Metropolitan Ins. Co., 428 F.2d 36, 38 (5th Cir. 1970) (emphasis added):

The district court found . . . that Mr. Lentz had, about three years before making this application for insurance, consulted Dr. S. D. Bullard with complaints of shortness of breath, headaches, and swollen ankles (ankle edema). Dr. Bullard found Mr. Lentz's blood pressure to be elevated, . . . diagnosed his condition as hypertensive cardiovascular disease, *advised Mr. Lentz accordingly,* and prescribed medication. After this initial examination in 1961, Dr. Bullard examined Mr. Lentz once again in 1961, fifteen times in 1962, four times in 1963, and once again in 1964, a few months before the insurance application. During these examinations, Mr. Lentz complained of a number of symptoms.

In 1962, Dr. Bullard had an urinalysis run of Mr. Lentz, with positive results, indicating a possible condition of diabetes. Therefore, Dr. Bullard had a fasting blood sugar test performed, and it produced a test result of 254 as compared with a normal upper limit of 120. . . . Dr. Bullard concluded that Mr. Lentz had diabetes mellitus, *advised Mr. Lentz of this diagnosis,* and prescribed medica-

---

such utterances, or by the latter's failure to ask follow-up questions that would have unearthed the true state of affairs.

8. In this regard, it is useful to compare what Mr. Batiste's treating physicians apparently knew about his condition with the one piece of evidence which purports to be the decedent's description of his own symptoms. The following excerpt is taken from Mr. Batiste's clinical record at the V. A. Hospital in New Orleans.

This 40 year old colored man gives the following history. For over five years he has noticed that when he walks a lot, works hard, eats excessively, or has intercourse he gets short of breath, tired [and] has pain in his chest. . . . At first, these symptoms lasted only one minute, but for the past three years they have been getting much worse, lasting as long as 15–20 minutes. He says he sometimes gets these attacks at night when asleep. The pain is directly in the center of his chest and only there; he says the attacks come on slowly at first—the tightness, then the pain. Rest makes the attack go away but *he must eat something (Tums or Rolaids) or drink something (7-Up) also to make him belch. When he belches the pain, etc. goes away.* At present he takes NTG for the attack and these give him relief in 2–3 minutes. . . . The patient smokes two packs/day, drinks 3–5 qts of whiskey/wk. and eats very well (steaks, vegetables, etc.). . . . *The patient [also] has excessive gas.* . . . (emphasis added, certain punctuation and abbreviations altered for clarity). This history is also consistent with a belief on Mr. Batiste's part that he was suffering primarily from some digestive or gastrointestinal disorder, and not the heart condition ultimately diagnosed.

tion and special diet. Dr. Bullard examined Mr. Lentz on approximately ten subsequent occasions. During this time, he varied the medication, *discussed the condition thoroughly with Mr. Lentz,* and had urinalysis and fasting blood sugar tests performed. The district court found that *Mr. Lentz was an alert businessman who was fully aware of his medical conditions,* both hypertension and diabetes. Certainly under such aggravated circumstances the insurer's defense should be sustained, but where, as here, those conditions are entirely absent, settled Louisiana jurisprudence requires that I hold for the plaintiff.

■ Plaintiff in this case also seeks to recover the penalty provided by Louisiana law for the allegedly arbitrary failure of New York Life to pay her the benefits of its policy promptly. In this respect the governing standard is that set out in LSA–R.S. 22:656, which provides as follows:

All death claims arising under policies of insurance issued or delivered within this state shall be settled by the insurer within sixty days from the date of receipt of due proof of death and should the insurer fail to do so without just cause, then the amount due shall bear interest at the rate of six per cent per annum from date of receipt of due proof of death by the insurer until paid.

The "interest" provision in this statute has been held to be a penalty, Buras v. Birmingham Fire Ins. Co. of Pa., 327 F.2d 238 (5th Cir. 1964), and thus has no effect on the awarding of pre-judgment legal interest where the conditions necessary for imposition of the Section 656 sanction have not been met. Ducote v. Life Ins. Co. of La., 245 So.2d 531 (La.App. 3d Cir. 1971); Harding v. Metropolitan Life Ins. Co., 188 So. 177, 185 (La.App. Orleans, 1939).

■ In the case at hand, I do not believe that the insurer's failure to make payment was "without just cause," as that term has come to be interpreted by Louisana courts. The test appears to be essentially one of the reasonableness of the defendant's belief that it had a defense to the plaintiff's claim under the policy, Brooks v. Louisiana & Southern Life Ins. Co., 246 So.2d 270 (La.App. 1st Cir. 1971); Ducote v. Life Ins. Co. of La., 245 So.2d 531 (La.App. 3d Cir. 1971), at least where the dispute involves a question of fact and not of law, *cf.,* Feist v. Universal Life Ins. Co., 274 So.2d 806 (La.App. 4th Cir. 1973). While a comparison with other cases is of limited utility, it does appear that state courts have been rather generous in their willingness to accept the insurer's position as "reasonable." Thus, in *Brooks, supra,* the deceased had perished of six gunshot wounds in her chest and shoulder. A coroner had ruled this death to be suicide, and the insurer had refused payment on that basis. Although such a conclusion bordered on incredible and ultimately was rejected by the trial court, it was held that the defendant "could properly, legally and in good conscience rely on the professional opinion of . . . the coroner, that the deceased's death was a suicide." 246 So.2d at 274.

■ Here, comparison of Mr. Batiste's pre-policy physical examination with his hospital records revealed serious, material discrepancies between them. The uncontradicted testimony at trial was to the effect that New York Life would never have issued Mr. Batiste a policy had they known the true state of his health; and the company had no way of knowing whether or not the decedent had withheld this information from it with the requisite "intent to deceive." Under such circumstances, it seems clear that New York Life's refusal to pay was not "without just cause," and I must refuse to award plaintiff any penalty.

Judgment will be entered accordingly.